# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

MARCIA W. DAVILLA, et al.    )
                               )
          Plaintiffs,    )
                               )
v.                              )       **Case No. CIV-15-01262-G**
                               )
ENABLE MIDSTREAM PARTNERS, )
LP, et al.                        )
                               )
          Defendants.    )

---

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND BRIEF IN SUPPORT

---

Stratton Taylor, OBA #10142
Toney D. Foster, OBA #16063
Clint Russell, OBA #19209
Kassie N. McCoy, OBA #31405
**TAYLOR, FOSTER, MALLETT, DOWNS, RAMSEY & RUSSELL**
400 West Fourth Street
P.O. Box 309
Claremore, OK 74018
Telephone: 918/343-4100
Fax: 918/343-4900

John A. Kenney, OBA #4976
Michael D. McClintock, OBA #18105
Michael K. Avery, OBA #22476
**MCAFEE & TAFT**
**A PROFESSIONAL CORPORATION**
211 North Robison
Two Leadership Square, Tenth Floor
Oklahoma City, OK 73102
Telephone: 405/235-9621
Fax: 405/270-7212

November 2, 2018

## TABLE OF CONTENTS

Motion...........................................................................................................1

Brief in Support...........................................................................................1

    I.     Introduction........................................................................1

    II.    Background.........................................................................4

    III.   Statement of Undisputed Material Facts..............................7

    IV.   Argument & Authorities....................................................13

          A.    Plaintiffs Should Not Be Awarded Disgorgement
               And/Or Should Not Be Awarded the Type of
               Disgorgement They Seek.............................................13

               1.    Oklahoma Law Provides the "Rule of Decision"
                     For Plaintiffs' Trespass Claim And Does Not
                     Permit Disgorgement.......................................13

               2.    Even if Federal Law Applies Without Consideration
                     Of Oklahoma Law, Plaintiffs Should Not Be
                     Awarded Disgorgement Based On the
                     Facts of This Case.............................................14

               3.    If Disgorgement Is Awarded, It Should Not Be In
                     The Amount Sought By Plaintiffs, But Instead Capped
                     At the Amount of Any Incremental Benefit Enable
                     Actually Received.............................................20

          B.    Plaintiffs Should Not Be Permitted to Recover
                Punitive Damages.......................................................26

         C.    An Trespass Compensable Trespass Accrued
                No Earlier Than 2006..................................................30

## <u>TABLE OF AUTHORITIES</u>

### <u>Statutes</u>

Okla. Stat. Ann. tit. 23, § 9.1…………………………………………………………27

### <u>Cases</u>

*Badillo v. Mid Century Ins. Co.*,
      121 P.3d 1080 (Okla. 2005)……………………………………………………26, 27

*Beck v. N. Nat. Gas Co.*
      170 F.3d 1018 (10th Cir. 1999)………………………………………………….13

*Black v. M & W Gear Co.*,
      269 F.3d 1220 (10th Cir. 2001)………………………………………………….28

*Cty. Of Oneida, N.Y. v. Oneida Indian Nation of N.Y. State*,
      470 U.S. 226 (1985)………………………………………………………6, 15, 17

*Everbrite Elec. Signs, Inc. v. Yezzi*,
      144 Wis. 2d 949 (Wis. 1988)…………………………………………………26-27

*Gergens v. McCollum*,
      111 P. 208 (Okla. 1909)………………………………………………………….14

*Hammond v. Cty. Of Madera*,
      859 F.2d 797 (9th Cir. 1988)……………………………………………...3, 18-19, 20

*Klein-Becker USA, LLC v. Englert*,
      711 F.3d 1153 (10th Cir. 2013)……………………………………………………...3

*Marsh v. Brooks*,
      49 U.S. 223 (1850)………………………………………………………………...6

*Martin v. Comcast Cablevision Corp. of California*,
      338 P.3d 107 (N.M. Ct. Ap. 2014)……………………………………………..22-23, 24

*Miller v. Aaacon Auto Transp., Inc.*,
      447 F. Supp. 1201 (S.D. Fla. 1978)……………………………………………...28

*Mullins v. Equitable Prod. Co.*,
      2003 WL 21754819 (W.D. Va. July 29, 2003)…………………………………..22, 24

*Montford and Co., Inc. v. S.E.C.,*
　　793 F.3d 76 (D.C. Cir. 2015)……………………………………………………21

*Nahno-Lopez v. Houser,*
　　625 F.3d 1279 (10th Cir. 2010)…………………………………………………14

*Nat'l Lead Co. v. Magnet Cove Bairum Corp.*
　　231 F. Supp. 208 (W.D. Ark. 1964)…………………………………………...19

*Philadelphia W., & B.R. Co. Quigley,*
　　21 How. 202, 214 (1859)……………………………………………………...28

*QS Wholesale, Inc. v. World Mktg., Inc.,*
　　2014 WL 12586120 (C.D. Cal. Jan. 7, 2014)…………………………………13

*Reed v. Aacon Auto Transp., Inc.,*
　　637 F.2d 1302 (10th Cir. 1981)…………………………………………………28

*SEC v. Maxxon,*
　　465 F.3d 1174 (10th Cir. 2006)………………………………………………...3

*Texas E. Transmission L.P. v. 7 Acres of Land,*
　　2016 WL 6901324 (S.D. Tex. Nov. 22, 2016)…………………………13, 22

*Tindle v. Hunter Marine Transp., Inc.,*
　　2016 WL 270481 (W.D. Ky. Jan. 21, 2016)…………………………………...13

*Underwriters at Lloyds of London v. N. Am. Van Lines,*
　　890 F.2d 1112 (10th Cir. 1989)…………………………………………………28

*United States v. Imperial Irr. Dist.,*
　　799 F. Supp. 1052 (S.D. Cal. 1992)…………………………………………...19

*United States v. Pen Oreille Pub. Utility Dist. No. 1,*
　　28 F.3d 1544 (9th Cir. 1994)………………………………………16-17, 19

*United States v. Santa Fe Pac, R.R.,*
　　314 U.S. 339 (1941)…………………………………………………6, 15, 17

*S.E.C. v. First City Fin. Corp.,*
　　890 F.2d 1215 (D.C. Cir. 1989)…………………………………………………20

*S.E.C. v. Teo,*
　　746 F.3d 90 (3d Cir. 2014)……………………………………………………20

*Starrh & Starrh Cotton Growers v. Aera Energy L.L.C.*,
        153 Cal. App. 4th 583 (2007)……………………………………………....21, 24

*Watson v. United States*,
        263 F. 700 (8th Cir. 1920)……………………………………………………19

*Young v. Appalachian Power Co.*,
        2008 WL 4571819 (S.D. W. Va. Oct. 10, 2008)…………………………………..3

## **Other Authorities**

C.J.S. Trespass § 132………………………………………………………………...18

Fed. R. Civ. P. 56………………………………………………………………...1

OUJI (Civil) 5.6………………………………………………………………...28

Restatement (Third) of Restitution and Unjust Enrichment……………………14, 20-21, 24

## MOTION

Pursuant to Fed. R. Civ. P. 56, Defendants Enable Midstream Partners LP, Enable GP LLC, and Enable Oklahoma Intrastate Transmission LLC (collectively, "Enable") move for partial summary judgment ordering that: (a) Plaintiffs are not entitled to the remedy of disgorgement or, alternatively, any disgorgement awarded should be limited to the actual, incremental benefit Enable may have received by virtue of any trespass; (b) Plaintiffs are not permitted to recover punitive damages; and (c) if a trespass has occurred, the trespass began no earlier than August 2006. In support of its Motion, Enable submits the following brief.

## BRIEF IN SUPPORT

### I.   INTRODUCTION

At the center of this lawsuit are approximately 1,300 feet of 20-inch natural gas pipeline that have been buried under Plaintiffs' property for nearly 40 years. The pipeline was placed under Plaintiffs' property pursuant to a 20-year easement that was granted in 1980 and expired in 2000. Plaintiffs contend, and this Court previously found, that the continued presence of the pipeline under Plaintiffs' property following the expiration of the original easement has, for some yet as undetermined period of time, constituted a trespass. Though seemingly innocuous, the fact neither Plaintiffs nor Judge Miles LaGrange were able to determine when Enable's alleged trespass accrued is quite important and reveals a critical flaw in Plaintiffs' trespass claim and the remedies sought in connection with the same.

Following the expiration of the original easement, Enable and its agents worked for years with Plaintiffs and the Bureau of Indian Affairs (the "BIA") in an attempt to renew the easement and/or obtain a new easement. Critically, at no point during these negotiations (or

at any point prior to the filing of this lawsuit) did Plaintiffs ever request or demand that Enable remove its pipeline. According to Plaintiffs, this decision was a mistake:

> Q.      [Did you ever] make a demand that they leave?
>
> A.      No. We did not do that. We should have. That's what we should have done. That's where we booboo'd at. We made a bad mistake there.

*See* [Ex. "1"] (Donna Davilla Depo.) at 65:5-8.[1]

Enable posits the reason Plaintiffs admit their decision not to demand Enable leave their property was "a bad mistake" is clear. Where, as here, a party remains on property following the expiration of an easement or lease, there can be no trespass until such time as the landowner demands the party vacate their property. Until and unless such a demand is made, there is not a trespass, but instead a "hold over" tenancy.[2]

Enable understands the question of whether there can be a trespass absent a demand to vacate will be answered by the Tenth Circuit in connection with Enable's pending appeal. Nevertheless, the fact that for years, Plaintiffs chose to negotiate with Enable regarding a renewed easement rather than demand Enable leave is critical to the question of what remedies are available to Plaintiffs in the event a trespass has occurred.

In connection with their trespass claim, Plaintiffs do not seek damages measured by "hold over" rents that should have been paid. Instead, Plaintiffs seek to disgorge from Enable any benefit / profit Enable received by utilizing the pipeline under Plaintiffs'

---

[1] Of note, Donna Davilla has a power of attorney to act for lead Plaintiff, Marcie Davilla, for purposes of dealing with Enable. *See* [Ex. "1"] (Donna Davilla Depo.) at 20:7-21:10 ("I'm power of attorney for Emaugobah.").

[2] For a full explanation of this legal position, Enable commends to the Court the briefing submitted to the Tenth Circuit in Enable's pending appeal of Judge Miles LaGrange's Summary Judgment Order.

property without an easement; a number Plaintiffs' expert estimates to be between approximately $1.7 million and $2.5 million. As discussed below, this remedy should not be available to Plaintiffs given the facts of this case.

"[B]ecause disgorgement of profits is an equitable remedy, the . . . [C]ourt must weigh 'principles of equity' before awarding disgorged profits." *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1161 (10th Cir. 2013); *SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir.2006) ("Disgorgement is by nature an equitable remedy . . . ."). And where, as here, there is a "lengthy delay in exercising [a] right of redress [for an alleged hold over trespass], equity simply does not call for the plaintiffs' to be afforded the remedy of disgorgement." *Young v. Appalachian Power Co.*, No. CIV.A.2:07-479, 2008 WL 4571819, at *8 (S.D.W. Va. Oct. 10, 2008). Were this not the case, landowners such as Plaintiffs would be "encourage[d] . . . to intentionally refrain from filing suit until such time as defendants ha[ve] amassed huge profits flowing from alleged misconduct." *Hammond v. Cty. of Madera*, 859 F.2d 797, 804 (9th Cir. 1988). "Such delay and unjust enrichment cannot be rewarded." *Id.*

As detailed below, it is undisputed Plaintiffs were aware of the presence of Enable's pipeline under their property following the expiration of the original easement. Armed with this knowledge, Plaintiffs did not demand Enable remove the pipeline, but instead first negotiated with Enable (by and through the BIA) concerning renewal and/or the granting of a new easement, and then instructed the BIA to cease all communications with Enable. Given these circumstances, equitable considerations do not call for Enable to be stripped of profits earned as punishment for intentional or conscious wrongdoing, nor should Plaintiffs benefit from intentionally allowing time to pass and profits to amass. In the end, there is no

evidence of nefarious conduct on the part of Enable. Enable was never asked to remove the pipeline and was, because it always believed a deal would get done, always a willing and good faith participant in renewal negotiations. Disgorgement should not be awarded as a windfall to Plaintiffs given these facts. For these and other reasons set forth below, Enable's Motion for Partial Summary Judgment should be granted.

## II.   BACKGROUND

The Enable family of companies own and operate a series of natural gas pipeline systems and associated assets. One of Enable's natural gas pipeline systems – which is owned and operated by Enable Oklahoma Intrastate Transmission LLC ("EOIT") – is approximately 2,200 miles in length and traverses the state of Oklahoma. This system is used to store and transport, rather than gather or process market natural gas.

Approximately 1,300 feet (or 0.011%) of EOIT's gas transportation and storage system (the "Subject Pipeline") run underneath approximately 0.73 acres of a 136.25 acre tract of property located in Caddo County, Oklahoma (the "Subject Property").[3] The surface estate of the Subject Property is a tract of land previously allotted to a Native American woman named Millie Oheltoint (or Emaughobah). The surface estate of the Subject

---

[3] EOIT's transportation and storage pipeline system is comprised of a number of different segments of pipe of varying characteristics. The Subject Pipeline is twenty inches in diameter and is part of an approximately 100 mile long segment of pipeline that runs between Canute and Cox City, Oklahoma and which is referred to by EOIT as "Line 25."

Property is, at present, held in trust by the United States government for the benefit of Plaintiffs (who are descendants of Ms. Oheltoint), as well as the Kiowa Tribe of Oklahoma.[4]

The Subject Pipeline was placed under the Subject Property in 1980 pursuant to a twenty year right-of-way easement granted by the Bureau of Indian Affairs (the "BIA"). EOIT's predecessor-in-interest succeeded to this right-of-way easement in and around 1999 and the right-of-way easement subsequently expired in November of 2000. Thereafter, EOIT and its predecessors-in-interest sought to renew the right-of-way easement and/or obtain a new right-of-way easement on the Subject Property. This work, which was detailed in Enable's Motion to Stay [Dkt. No. 43] and in the Statement of Undisputed Facts below, involved negotiations between EOIT, its agents, the BIA, and the beneficial owners of the Subject Property at the time, some, though not all of whom are Plaintiffs in this lawsuit.

In connection with these negotiations, in June of 2008, the BIA appears to have granted Enable a renewed 20-year easement from November 2000 through November 2020 – Enable has no record of the BIA granting this easement, though documents indicate it was granted. Plaintiffs appealed this BIA action and in March of 2010 the BIA reversed its decision and "remand[ed] th[e] case for further negotiation." There were, however, limited contacts between the parties in the following years due in no small part to: (a) Ms. Davilla's instruction to the BIA not to contact Enable because counsel for Plaintiffs would do so; and (b) Plaintiffs inability to obtain counsel until the fall of 2015 who then contacted Enable.

---

[4] According to Plaintiffs' expert, the Kiowa Tribe of Oklahoma became a beneficial owner of a small portion of the surface estate of the Subject Property via transfers made in November 2008 and February 2013 pursuant to the escheat provisions of the American Indian Probate Reform Act of 2003. At present, the Kiowa Tribe owns approximately 1.1% of the beneficial interests in the surface estate of the Subject Property. *See* [Ex. "2"] (Neumiller Report) at 18.

After Plaintiffs' counsel contacted Enable in the fall of 2015, Enable initiated a condemnation proceeding and Plaintiffs filed this trespass lawsuit. At the outset of this action, the parties disputed the law applicable to Plaintiffs' claim. Enable contended Oklahoma law governs. Plaintiffs urged for the application of federal common law.

In an Order entered on November 28, 2016, Judge Miles LaGrange ruled that "federal common law governs Plaintiffs' trespass claim." *See* Order [Dkt. No. 51] at 5.[5] In connection with this ruling, Judge Miles LaGrange indicated that because federal common law applies to Plaintiffs' trespass claim:

> [P]laintiffs will be able to pursue those damages that are available under federal common law" including "ejectment and damages, *Marsh v. Brooks*, 49 U.S. 223, 232 (1850); accounting, *United States v. Santa Fe Pac. R.R.*, 314 U.S. 339, 359 (1941), and damages, [*Cty. Of Oneida, N.Y. v. Oneida Indian Nation of N.Y. State*], 470 U.S. at 233-234.

*Id.* at 5 n.2. Judge Miles LaGrange made no finding regarding whether any or all of these remedies would be available or appropriate, only that Plaintiffs "will be able to pursue" them given that federal common law governs. *Id.*

Approximately four months later, Judge Miles LaGrange entered an Order on Plaintiffs' Motion for Partial Summary Judgment wherein she concluded that at some undetermined point in time after November 2000 (when the original right-of-way easement expired), the presence of the Subject Pipeline on the Subject Property began to constitute a

---

[5] Enable has appealed Judge Miles LaGrange's ruling regarding applicable law, but as of the date of the filing of this Motion, there has been no ruling from the Tenth Circuit. Enable reserves the right to modify this Motion and/or to seek leave to file a new Motion depending on the outcome of its appeal.

trespass under federal law. *See generally* Order [Dkt. No. 56].[6] And while Judge Miles LaGrange's Order included a mandate that the Subject Pipeline be removed from the Subject Property (relating to the remedy of ejectment), there was no discussion of any other remedies that were sought or which might be appropriately awarded to Plaintiffs.

Plaintiffs contend that because Judge Miles LaGrange noted that in her estimation the trespass she found was "not unintentional," *see id.* at 9, they are entitled to disgorge from Enable any benefit Enable has received as a result of the trespass found. Plaintiffs also seek an award of punitive damages. There has not, however, been any ruling from the Court that disgorgement (no matter how measured) or punitive damages are appropriate or should be awarded based on the facts of this case. Rather, as relevant here, at present the only two rulings of the Court are: (a) that the presence of the Subject Pipeline on the Subject Property at some point began to constitute a trespass under federal common law; and (b) because federal common law governs, Plaintiffs are "able to pursue" the remedy of an accounting.

## III.   STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     The surface estate of the Subject Property is owned by the United States government, through the BIA, for the benefit of Plaintiffs and the Kiowa Tribe of Oklahoma. *See* JSR [Dkt. No. 85] at 3 (Stipulated Fact No. 1); *id.* at 4 (Stipulated Fact No. 9).

---

[6] Judge Miles LaGrange noted that because Plaintiffs sought only a determination of liability, the question of "when plaintiffs' trespass claim accrued [wa]s not relevant" would only need be considered "for purposes of determining plaintiffs' damages." *See* Order [Dkt. No. 56] at 7. Judge Miles LaGrange did note, however, that "based upon the evidence submitted, the latest that the plaintiffs' trespass claim accrued was on or about March 24, 2010"; the date of Director Deerinwater's decision. *See id.* at 7 n.6.

In connection with its appeal of her Order determining the applicable law, Enable has appealed Judge Miles LaGrange's summary judgment ruling, as well. Enable reserves the right to modify this Motion and/or to seek leave to file a new Motion depending on the outcome of its appeal.

2.      On November 19, 1980, the BIA granted a twenty-year right of way easement under 0.73 acres of the Subject Property to Producer's Gas Company ("Producer's"). *See id.* at 3-4 (Stipulated Fact No. 2); *see also* [Ex. "3"] at (Davilla0083).

3.      The presence of the Subject Pipeline under the Subject Property has not prevented any intended use of the Subject Property by Plaintiffs. *See, e.g.,* [Ex. "4"] (B. Blackstar Depo.) at 54:1-21; [Ex. "5"] (T. Blackstar Depo.) at 47:7-48:12.

4.      In and around 1999, Enable acquired Producer's successor-in-interest and therefore, succeeded to the rights of the original right-of-way easement under the Subject Property. *See* JSR [Dkt. No. 85] at 3-4 (Stipulated Fact No. 2).

5.      On June 14, 2002, Enable submitted an application for a renewed right-of-way easement under the Subject Property. *See* [Ex. "3"] at (Davilla0086-88).

6.      Enable offered $40 / rod in its renewal application; an amount determined by an appraisal performed at the behest of the BIA and approved by the BIA's Office of Special Trustee ("OST"), whose review was done "to assure that [the appraisal w]as supported by objectively selected and adequately documented data that is logically analyzed to obtain a reasonable conclusion of value." *See* [Ex. "3"] at (Davilla0092-93); *see also* [Ex. "6"] (Appraisal); [Ex. "7"] (OST Approval).

7.      The $40 / rod offer was also the going rate for buying pipeline right-of-way from private landowners in areas surrounding the Subject Property. *See* [Ex. "8"] (Deposition Testimony of Enable's Director of Right-of-Way and Land Management) at 46:24-47:1 ("[A]t that particular time the going rate for me buying new right-of-way for private landowners was $40 a rod.").

8

8.      On February 7, 2005, Ms. Davilla wrote a letter to the BIA requesting information concerning Enable's renewal application. *See* [Ex. "3"] at (Davilla00090).

9.      On May 10, 2005, the BIA wrote a letter to Ms. Davilla explaining Enable's renewal offer was supported by an appraisal and review by the OST. The BIA "encourage[d Ms. Davilla and the other landowners] to finalize negotiations with [Enable] and provide [their] written consent as soon as possible." *See id.* at (Davilla0092-93).

10.     On December 5, 2005, Ms. Davilla wrote a letter to Enable demanding $63,000 be paid for a renewed, twenty-year right-of-way easement under 0.73 acres of the Subject Property. *See* [Ex. "9"] (Davilla Letter). This $63,000 was approximately the same amount that the appraisal had concluded the entire 136.25 acres of the surface of the Subject Property was worth in fee. *See* [Ex. "6"] (Appraisal).

11.     On April 13, 2006, BIA cancelled Enable's renewal application. *See* [Ex. "10"].

12.     At or about the same time, the BIA wrote to Ms. Davilla informing her that it did "not have authority to negotiate for a value exceeding the appraised value" and that the BIA "cancelled Enogex's application" and would be making a trespass assessment against Enable. *See* [Ex. "3"] at (Davilla00096).

13.     On August 24, 2006, the BIA levied the trespass assessment in the amount of $1,098.35. This amount was calculated by taking the $40 / rod value for a twenty year period found by the appraisal and pro-rating it over a period of time beginning with the expiration of the original right-of-way easement and ending at the time of the assessment. *See* [Ex. "11"] (Trespass Assessment); [Ex. "12"] (Deerinwater Letter) at 2.

14.     On September 23, 2006, Enable paid this trespass assessment and the funds were distributed to the beneficial owners of the surface estate of the Subject Property. *See* [Ex. "13"] (Check and Payment Coupon); *see also* [Ex. "14"] (Discovery Responses).

15.     In the wake of this payment, BIA considered the "trespass . . . resolved" as noted in a "certified letter to [Enable], dated August 24, 2006. *See* [Ex. "12"] at 5.

16.     On December 21, 2007, the beneficial owners of the Subject Property met with the BIA and "were advised of Enable's intentions to file condemnation proceedings and were given the opportunity, which they refused, to call Enable regarding possible settlement." *See id.* at 2.

17.     On February 15, 2008, the BIA wrote a letter encouraging Enable not to file a condemnation proceeding, but to instead re-submit its renewal application. *See* [Ex. "15"].

18.     On May 23, 2008, Enable re-submitted its renewal application. *See* [Ex. "16"].

19.     On June 23, 2008, the BIA sent a letter to the beneficial owners of the Subject Property indicating it had approved Enable's application. *See* [Ex. "3"] at (Davilla00100-01).

20.     Following the death of Euginia Allison Keahbone (one of the beneficial owners of the Subject Property) in 2008, 0.009% ownership of the Subject Property escheated to the Kiowa Tribe of Oklahoma pursuant to the American Indian Probate Reform Act of 2003. *See* [Ex. "2"] (Neumiller Report) at 18.[7]

---

[7] This Court has determined that by virtue of this escheat, Enable, for the first time, lost the right to condemn an easement under the Subject Property. *See Enable Oklahoma Intrastate Transmission, LLC v. a 25 Foot Wide Easement, et al.*, Case No. 15-cv-01250 [Dkt. No. 55].

21.     Following the BIA's statement that Enable's renewed application had been approved, Ms. Davilla and several other beneficial owners of the Subject Property filed an appeal. *See* [Ex. "3"] (Appeal).

22.     On March 23, 2010, Regional Director Dan Deerinwater of the BIA granted the appeal. After concluding that Enable's renewed application should not have been granted, Director Deerinwater "remand[ed] th[e] case for further negotiation" explaining that only if "a right of way for th[e] tract [wa]s not timely secured, [should Enable] be directed to move the pipeline off the subject property."[8] *See* [Ex. "12"].

23.     In the wake of Director Deerinwater's decision, Ms. Davilla wrote a letter to the BIA instructing that the agency "not contact [Enable]." Ms. Davilla explained that beneficial owners of the Subject Property had retained counsel that would contact Enable on their behalf. *See* [Ex. "17"] (Davilla Letter).

24.     The counsel identified by Ms. Davilla, however, never contacted Enable. Over the next several years, Plaintiffs attempted to obtain counsel who could and/or would negotiate with Enable on their behalf, but were unable to find a lawyer to represent them. *See* [Ex. "1"] (Deposition of Donna Davilla) at 61:17-62:12; 63:7-64:10 ("Q. Okay. So you said Mr. Gonzales, to your understanding, to you that he wasn't going to be able to help? A. Correct. Q. And it's my understanding that, then, there was an effort to find additional legal counsel? A. Yeah. Q. okay. Over – A. Like 10 different efforts . . . Q. . . . [D]o you know

---

[8] This action was consistent with 25 C.F.R. § 169.410 which states that the BIA will not consider a holdover tenant to be trespassing so long as the parties are continuing to negotiate regarding a renewal right-of-way easement.

whether or not any of those individuals with whom you all spoke ever contacted Enogex? A. No, none of them ever contacted Enogex . . . .").

25.     Plaintiffs never made a demand that Enable remove the Subject Pipeline. *See id.* at 63:11-25 ("Q. . . . [D]o you know whether or not any of those individuals with whom you all spoke ever contacted Enogex? A. No, none of them ever contacted Enogex that I know of."); *id.* at 64:16-65:13 ("Q. Even to make a demand that they leave? A. No. We did not do that. We should have. That's what we should have done. That's where we booboo'd at. We made a bad mistake there.").

26.     Plaintiffs finally sent a letter to Enable in August 2015, but still did not demand removal of the Subject Pipeline at that time. *See* [Ex. "18"].

27.     There are no existing customers Enable would not be able to provide services to if the Subject Pipeline were removed from the Subject Property. *See* [Ex. "19"] (Deposition of Enable's Director of Western Division Field Operations P. Soell) at 28:12-17.

28.     Enable is accustomed to BIA right-of-way negotiations "stretch[ing] out over a number of years to get renewed," *see* Ex. ["8"] (Green Depo.) at 49:7-19, "really believed that [they] would be able to make a deal" with Plaintiffs, *see* [Ex. "20"] (Deposition of Enable Contract Land Man J. Coury) at 38:18-39:3.

## IV.   ARGUMENT & AUTHORITIES

### A.   PLAINTIFFS SHOULD NOT BE AWARDED DISGORGEMENT AND/OR SHOULD NOT BE AWARDED THE TYPE OF DISGORGEMENT THEY SEEK

Assuming there has been a trespass (and this finding is the subject of Enable's currently pending appeal), the question of what remedies should be awarded to Plaintiffs is a question that is properly resolved at the summary judgment stage. *See, e.g., Beck v. N. Nat.*

*Gas Co.*, 170 F.3d 1018, 1024 (10th Cir. 1999) (affirming district court's "legal determination" at the summary judgment stage that plaintiffs' measure of damages for trespass and unjust enrichment were limited to the fair rental value of their land); *Texas E. Transmission, LP v. 7 Acres of Land*, No. CV H-16-2498, 2016 WL 6901324, at *5 (S.D. Tex. Nov. 22, 2016) (deciding at the summary judgment stage that disgorgement of pipeline company's profits was unavailable as a matter of law); *Tindle v. Hunter Marine Transp., Inc.*, No. 514CV00110TBRLLK, 2016 WL 270481 (W.D. Ky. Jan. 21, 2016) (granting summary judgment to defendant "on the categories of damages that [plaintiff] may recover"); *QS Wholesale, Inc. v. World Mktg., Inc.*, No. SA12CV0451DOCRNBX, 2014 WL 12586120, at *12 (C.D. Cal. Jan. 7, 2014) (explaining that the court had already "ruled out as a matter of law at the summary judgment stage" the availability of "loss of market presence" damages). And for several reasons, Enable respectfully submits that disgorgement is not available and, in any event, is not available as requested by Plaintiffs.

### 1.   OKLAHOMA LAW PROVIDES THE "RULE OF DECISION" FOR PLAINTIFFS' TRESPASS CLAIM AND DOES NOT PERMIT DISGORGEMENT

As an initial matter, Enable disagrees with Judge Miles LaGrange's conclusion that the Oklahoma common law of trespass plays no role in analyzing Plaintiffs' trespass claim. As Enable has previously argued to this Court and to the Tenth Circuit, well established precedent holds that for purposes of a federal common law claim of continuing trespass against beneficial owners of an Indian allotment, Oklahoma state law provides "the rule of decision . . . ." *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1282 (10th Cir. 2010). And disgorgement is not an available remedy under Oklahoma law. *See, e.g.*, *Gergens v. McCollum*, 111 P. 208, 210 (Okla. 1909). In light of the foregoing, Enable respectfully requests the

Court's prior ruling be reconsidered, that Oklahoma laws be applied, and that disgorgement not be awarded to Plaintiffs.

> **2.** **EVEN IF FEDERAL LAW APPLIES WITHOUT CONSIDERATION OF OKLAHOMA LAW, PLAINTIFFS SHOULD NOT BE AWARDED DISGORGEMENT BASED ON THE FACTS OF THIS CASE**

Assuming Oklahoma law can be ignored (which Enable disputes), the application of only federal common law does not, as Plaintiffs suggest, *ipso facto* demand disgorgement. To be sure, and as Judge Miles LaGrange noted in her previous Summary Judgment Order, if federal law applies Plaintiffs can "pursue" a claim for an accounting / disgorgement. But they are not automatically entitled the same. Rather, certain findings – which are not supported by the evidence in this case – must be made before disgorgement will be awarded.

For disgorgement to be an available remedy in a trespass action, there must be a finding of intentionality and/or conscious wrongdoing on the part of the trespassing party. *See, e.g.*, Restatement (Third) of Restitution and Unjust Enrichment § 51. Notwithstanding Judge Miles LaGrange's previous statement that Enable's trespass was "not unintentional," Enable respectfully contends that a jury could not, based on the undisputed facts of this case, reasonably find any trespass on the part of Enable was "conscious" or "intentional" so as to support a disgorgement award.

After the initial right-of-way easement expired, Enable dealt with the BIA and the owners of the Subject Property in an attempt to obtain a new right-of-way easement. During this extended period, there were negotiations, a trespass assessment was paid and accepted, a new right-of-way easement was granted, and there was a multi-year appeal of the same which ended with an order directing that there be further negotiations between the parties. *See*

14

UMF Nos. 5 - 22. At no point during this period did Plaintiffs ever communicate with or demand Enable evacuate the Subject Property. *See* UMF Nos. 23 - 26. Instead, Plaintiffs instructed the BIA not to contact Enable because they were going to negotiate for themselves, but this never happened. *See id* The hiatus of communications between the parties is attributable not to Enable, but to the inaction of Plaintiffs.

Enable was, of course, aware the Subject Pipeline was under the Subject Property while negotiations to renew the right-of-way easement were taking place. Critically, however, Plaintiffs were also aware of this fact as evidenced by ongoing negotiations. This is not a case of surreptitious and/or nefarious use of a landowner's property without their knowledge or consent. Rather, the facts are more akin to a holdover tenant trying to negotiate a new lease. Enable contends no reasonable jury could find the intentionality required to award disgorgement to Plaintiffs. As set forth below, courts facing similar sets of circumstances and applying federal common law have agreed.

In support of their argument that accounting / disgorgement remedies are, as a matter of law, available, Plaintiffs place great reliance on the Supreme Court's decisions in *Santa Fe* and *Oneida* cited by Judge Miles LaGrange. Plaintiffs say these cases stand for the proposition that any time there is a trespass to Indian land, accounting and disgorgement are appropriate remedies. *See* Motion (Docket No. 54) at 10-11. This is incorrect.

As this Court and others have observed, "[t]he Supreme Court has recognized a variety of federal common law causes of action to protect Indian lands from trespass, including actions for ejectment, accounting of profits, and damages." *See, e.g.*, *United States v. Pend Oreille Pub. Utility Dist. No. 1*, 28 F.3d 1544, 1549 n.8 (9th Cir. 1994). The potential

availability of accounting and disgorgement remedies has not, however, led to the inexorable conclusion that these are the appropriate remedy for all trespasses to Indian land. Indeed in many cases, including some cited by Plaintiffs, these measures of damages were not awarded despite being available.

A good example of such a ruling is found in the *Pend Oreille* case from the Ninth Circuit; a decision Plaintiffs have cited in support of their contention that they are entitled to an accounting / disgorgement. *See* Motion to Compel [Dkt. No. 54] at 11. In *Pend Oreille*, the Ninth Circuit did not award disgorgement despite the existence of a trespass. Instead, the court determined that "[r]equiring the [trespassing] Utility to reimburse the Tribe for the most profitable use of its land" was the proper measure of damages under the federal common law. *See* 28 F.3d at 1551.

The defendant in *Pend Oreille* was a utility that operated a dam "on the Pend Oreille River, which forms the western boundary of the Kalispel Indian Reservation in northeastern Washington." *See id.* at 1547.  The utility's operation of this dam caused the river to flood a portion of the Reservation. At the time of the flooding, "[s]ection 10(e)(1) of the [Federal] Power Act prohibit[ed] the use of tribal lands embraced within a reservation unless the [Federal Power] Commission fixe[d] a 'reasonable annual charge' for the use of the lands and the Indian tribe approve[d] the charge." *See id.* at 1548 (citing 16 U.S.C. § 803(e)(1)). However, because the utility "fail[ed] . . . to disclose that Reservation lands would be flooded," "[n]one of these conditions were met." *Id.*

The plaintiffs, which included the tribe, filed a lawsuit alleging the flooding trespassed on the Reservation. The district court agreed, concluded Washington law governed the

claim, and awarded damages measured by "the rental value of the land for grazing." *See id.* at 1549. The plaintiffs then appealed.

On appeal, the Ninth Circuit concluded federal, rather than state common law applied to the claim for trespass. *See id.* From there, the Ninth Circuit concluded that rental value was the proper measure of damage, but concluded that fixing this amount by determining what would have been paid for grazing was inappropriate because it did not take into consideration the opportunity for the Tribe to realize "the most profitable use of its land." *See id.* at 1551. According to the Ninth Circuit, the most profitable use of the land would be to, in effect, "lease" the land to the utility under the rubric of Section 10(e) of the Federal Power Act because such a "lease" would apparently call for higher payments than a grazing lease. *See id.* at 1550-51 (noting that the "lease" payments under § 10(e) of the Federal Power Act were to be "based upon the commercial value of the tribal lands involved, for the most profitable purpose for which suitable, including power development").

As *Pend Orielle* and other decisions made after the Supreme Court's holdings in *Santa Fe* and *Oneida* cited below make apparent, although accounting and disgorgement are available remedies for trespass to Indian lands, awarding these remedies is not mandatory or appropriate in every case. Instead, the facts of each case determine which remedies are appropriate. Were that not the case, an accounting and disgorgement would be ordered in every Indian trespass case. But this is not what actually happens.

It is well established among all bodies of common law (state or federal) that "[d]amage remedies for trespass are essentially compensatory and not punitive." *Hammond*,

17

859 F.2d at 804; *accord* 87 C.J.S. Trespass § 132 (noting "the general rule is that the measure of damages in trespass actions is such sum as will compensate the person injured for the loss sustained"). Bearing this in mind, Plaintiffs are not entitled to disgorge Enable's profits unless such profits would compensate Plaintiffs in some way for damages they suffered as a result of an alleged trespass. A review of relevant case law bears this point out.

In *Hammond*, the beneficial owners of an Indian allotment sued a county government alleging the government had trespassed over the allotment in connection with the construction of a road. In connection with this claim, the plaintiffs sought to disgorge the amount of increased tax revenues the county received from a subdivision that was developed based on the ability to access land via the trespassing road. The Ninth Circuit concluded such "profits" were not properly recoverable and that instead, "[c]ommon law principles . . . indicate[d] that reasonable rental value [wa]s the appropriate remedy for [the] trespass." *See* 859 F.2d at 804.

In reaching this conclusion, the *Hammond* court observed the plaintiffs had not actually been damaged by the construction of the subdivision and/or the increased revenues the county was able to realize as a result of its construction. Specifically, the court noted that "since [the plaintiffs] never owned the . . . subdivision and thus had no right to develop it, an award of damages in the amount of revenues from the subdivision would constitute a windfall for the plaintiffs." *Id.* The *Hammond* court found the situation was the same as where damages from a trespassing mining company are limited to lease value where the landowner is without the ability to develop the minerals in question. *See id.* (citing *Nat'l Lead Co. v. Magnet Cove Barium Corp.*, 231 F. Supp. 208 (W.D. Ark. 1964)). A landowner without

the right or ability to develop minerals is not damaged by the profits another party receives by developing the minerals. Instead, the landowner is only damaged by the lost opportunity to lease his land to a mineral developer or another party. *See id.*; *see also Watson v. United States*, 263 F. 700 (8th Cir. 1920) (holding that rental value, not rents and profits, was the proper measure of damage for trespass over Osage Indian Allotments held in trust by the United States); *Pend Oreille*, 28 F.3d at 1551 (requiring a trespassing utility to reimburse a tribe only for the most profitable use of the tribe's property which the tribe was denied the opportunity to realize as a result of the trespass); *United States v. Imperial Irr. Dist.*, 799 F. Supp. 1052, 1066 (S.D. Cal. 1992) ("The parties agree that the proper measure of damages for trespass is the fair rental value of the property, assuming that the property is being put to its highest and best use.") (citing *Hammond*).

Against this backdrop, Enable respectfully contends that disgorgement should not be awarded in this case. It is undisputed that Plaintiffs were not, as a result of Enable's actions, prohibited from making full use of the Subject Property. *See* UMF No. 3. Rather, Plaintiffs were, at worst, prevented from renting or leasing the Subject Property to another tenant at a fair market value, though there is no evidence of any offers to lease the Subject Property that were prevented by the presence of the Subject Pipeline. Perhaps more importantly, Plaintiffs were, at all relevant times, aware of the presence of the Subject Pipeline under the Subject Property and participated in renewal negotiations. *See* UMF Nos. 5 - 22. Yet at no point in the next approximately fifteen years of interaction between the parties did Plaintiffs ever request or demand that Enable remove the Subject Pipeline. *See* UMF Nos. 23 - 26. Instead, Plaintiffs continued to negotiate with Enable and the BIA and/or simply were silent. *See id.*

19

In sum, fully aware of the situation, Plaintiffs decided to negotiate with Enable and/or remain silent all the while knowing the Subject Pipeline remained on the Subject Property. As a result, if Plaintiffs were awarded the disgorgement they seek, this "would effectively compensate the plaintiffs for delaying the filing of this action." *Hammond*, 859 F.2d at 804.  Plaintiffs should not be "encourage[d] . . . to intentionally refrain from filing suit until such time as defendants ha[ve] amassed huge profits flowing from alleged misconduct.  Such delay and unjust enrichment cannot be rewarded." *Id.*

### 3.    IF DISGORGEMENT IS AWARDED, IT SHOULD NOT BE IN THE AMOUNT SOUGHT BY PLAINTIFFS, BUT INSTEAD CAPPED AT THE AMOUNT OF ANY INCREMENTAL BENEFIT ENABLE ACTUALLY RECEIVED

"Disgorgement primarily serves to prevent unjust enrichment" and may be used to deter wrongdoing by dis-incentivizing future conduct. However, it "may not be used punitively." *S.E.C. v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989); *see also S.E.C. v. Teo*, 746 F.3d 90, 103 (3d Cir. 2014) (noting that "disgorgement may not be used punitively"); Restatement of the Law – Restitution, § 51 Enrichment by Misconduct; Disgorgement; Accounting (explaining that "[d]isgorgement of wrongful gain is not a punitive remedy" because "the wrongdoer who is deprived of an illicit gain is ideally left in the position he would have occupied had there been no misconduct").

To keep disgorgement from being punitive, profits and/or benefits disgorged must be "directly linked to the wrongful trespass." *See Starrh & Starrh Cotton Growers v. Aera Energy LLC*, 153 Cal. App. 4th 583, 604 (2007). Put otherwise, because "[d]isgorgement deprives wrongdoers of the profits obtained from their violations," "the touchstone of a disgorgement calculation is identifying a causal link between the illegal activity and the profit

sought to be disgorged." *Montford and Co., Inc. v. S.E.C.*, 793 F.3d 76, 83-84 (D.C. Cir. 2015) (internal quotation marks and alteration omitted). This causal link is needed because "[i]t is not enough to simply measure the profits earned in any given time period or proportion them to a particular part of the trespasser's business." *Starrh*, 153 Cal. App. 4th at 604-05. Yet this is precisely what Plaintiffs seek to do here.

To understand and calculate any benefit enjoyed by Enable that can be sufficiently "linked" to the presence of the Subject Pipeline under the Subject Property, Enable respectfully submits that the proper analysis is to compare what happened during the time of any trespass and what would have happened had the trespass not occurred; *i.e.*, if the Subject Pipeline had been removed from the Subject Property when any trespass accrued. By comparing these two scenarios, one can determine what incremental benefit, if any, Enable enjoyed as a result of any trespass, thus providing the required link between the wrongful activity and what is sought to be disgorged. *See* Carpenter Depo. [Ex. "21"] at 15:19-16:3.

It is undisputed that had the Subject Pipeline been removed from the Subject Property at the time any trespass accrued, Enable would have still been able to serve all of its customers and earn all the revenues it earned during the period of any trespass. *See* UMF No. 27. In similar circumstances involving pipelines and similar structures, courts routinely deny requests to disgorge profits because they are not linked to a trespass.

For example, in *Mullins v. Equitable Prod. Co.*, No. 2:03CV00001, 2003 WL 21754819, at *3–4 (W.D. Va. July 29, 2003), the court refused to disgorge profits associated with a trespassing pipeline reasoning that because "[n]one of the gas transmitted came from [the landowner's] land and the evidence is that the [pipeline company's] business could have just

as easily been conducted without the use of [the landowner's] property." *See also Texas E. Transmission,* 2016 WL 6901324, at *5 (S.D. Tex. Nov. 22, 2016) (noting that "[t]he Property Owners offer no authority, and the court can find none, for the proposition that they are entitled to disgorgement relief" against the pipeline company who operated under landowners' land with an expired easement); *Martin v. Comcast Cablevision Corp. of California*, 338 P.3d 107, 111 (N.M. Ct. App. 2014) (explaining that the benefits enjoyed by a trespassing line were not the result of using plaintiff's land but of the company's "business enterprise," meaning that the benefit to the company "is better understood as the savings it realized by using [plaintiff's] property without paying for the privilege").

In light of the foregoing, Enable respectfully contends that the correct way to measure any benefit to Enable by virtue of the alleged trespass would be to determine how much interest Enable earned by deferring the costs of removal and/or re-route of the Subject Pipeline from the time such expenses should have been incurred (when the trespass accrued) to the time the expenses were actually made. *See* Report of Dr. Carpenter [Ex. "22"] at 3-4 (¶ 6). The interest earned during this deferral is the only incremental benefit that can be casually linked to the allegedly wrongful conduct of Enable and which could be awarded as disgorgement if the remedy were available to Plaintiffs. Enable calculates this amount to be somewhere between $130,000 and $355,000, depending on when any trespass is found to have accrued.

Rather than calculate a number that accurately reflects an allegedly incremental gain on the part of Enable, Plaintiffs do precisely what the law of disgorgement prohibits. Plaintiffs apportion EOIT's total transportation and storage revenues and profits and profits

using the approximately 1,300 feet of the Subject Pipeline as the numerator and approximately 2,200 miles of Enable's pipeline system as the denominator to come to a fraction of 0..011%. *See* Expert Report of James M. Gray [Ex. "23"].[9] Put otherwise, Plaintiffs "allocate[] revenue and expenses of the company as a whole to the [allegedly] trespassing pipe" without regard to which, if any revenues and expenses are actually attributable or "linked" to the Subject Pipeline. *See id.* at 3. This type of *ad hoc* apportionment fails to establish the required nexus between what Plaintiffs seek to disgorge and any incremental benefit Enable actually enjoyed as a result of its alleged trespass.[10] *See, e.g.*, *Starrh*, 153 Cal. App. 4th at 604-05 (noting that because a "link" is required, "[i]t is not enough to simply measure the profits earned in any given time period or proportion them to a particular part of the trespasser's business"); *Mullins*, No. 2:03CV00001, 2003 WL 21754819, at *3–4 (explaining that profits could not be disgorged because "[n]one of the gas transmitted came from [the landowner's] land and the evidence is that the [pipeline company's] business could have just as easily been conducted without the use of [the landowner's] property"); *Martin*, 338 P.3d at 111 (explaining that the benefits enjoyed by a trespassing line were not the result of using plaintiff's land but of the company's "business

---

[9] This results in figures of approximately $1.15 million (revenues) and $35,000 (profits).

[10] Worse yet, Plaintiffs posit that they should be able to disgorge not merely the profits associated with Enable's alleged trespass (profits for which Plaintiffs establish no nexus or link to the trespass), but instead the gross revenues received by Enable. *See id.* at 2; *see also* Deposition Transcript of Gray [Ex. "24"] at 20:14-21:2. This plainly ignores that the law of disgorgement permits the recovery of only "the **net profit** attributable to the underlying wrong." *See* Restatement (Third) of Restitution and Unjust Enrichment § 51(4) (emphasis added).

enterprise," meaning that the benefit to the company "is better understood as the savings it realized by using [plaintiff's] property without paying for the privilege").

Because it is undisputed that Enable would have earned all of the revenues it did earn even without the alleged trespass, *see* UMF No. 27, the only incremental benefit that could possibly be attributed to Enable's complained of conduct is the interest earned / savings on money not borrowed resulting from Enable's ability to defer the costs of removing and re-routing the Subject Pipeline from the date any trespass accrued.[11] Plaintiffs have offered a disgorgement figure related to this theory, as well, which exceeds $1 million. Enable disputes the numbers calculated by Plaintiffs' expert, and that dispute is not ripe for summary adjudication. What is ripe for summary adjudication, however, is the fact that this paradigm (deferred costs savings) is the only paradigm pursuant to which a jury could accurately measure any incremental benefit to Enable that has a sufficient "link" or "nexus" to the complained of actions of Enable.

Of final note, during the recently conducted deposition of Plaintiffs' expert, it was revealed Plaintiffs contend the Court and/or a jury could award to Plaintiffs both the amount of any revenues / profits Plaintiffs say Enable earned via the alleged trespass (which lack a causal nexus and which are approximately $1.15 million or $350,000) **and** the more than $1 million in savings Plaintiffs calculate in connection with deferred costs *See* Deposition Transcript of Gray [Ex. "24"] at 20:14-21:2. This should not be permitted.

As discussed *supra*, if awarded, the goal of disgorgement is to ensure the wrongdoer is in no better position now than he would have been but for his unlawful act. *See* Restatement

---

[11] Enable estimates this amount to be between approximately $137,000 and $355,000, depending on when any trespass may have accrued. *See* [Ex. "22"] (Carpenter Report) at 5.

(Third) of Restitution and Unjust Enrichment § 51(4). With this in mind, if the Court and/or a jury were to strip Enable of any benefit it received by deferring the costs of removing and relocating the Subject Pipeline, there would be no basis to also award profits earned from use of the Subject Pipeline (assuming such profits could somehow be tied to use of the Subject Pipeline). As Dr. Paul Carpenter has explained, if Enable were stripped of the benefit of deferring removal and relocation costs, it would be as though Enable had actually removed and relocated the Subject Pipeline at the time any trespass accrued. *See* Deposition Transcript of Carpenter [Ex. "21"] at 39:16-40:18. And had Enable done so, it would have earned the very profits Plaintiffs seek to disgorge. As a result, an award of both the benefit of deferred costs and profits earned would not restore Enable to the position Plaintiffs say the company should have been (*i.e.*, put Enable back where it would have been without the trespass), but would instead be punitive and therefore, not permissible under the law.

## B.   PLAINTIFFS SHOULD NOT BE PERMITTED TO RECOVER PUNITIVE DAMAGES

In addition to seeking compensatory damages (presumably measured by the costs of rents not paid to Plaintiffs) and disgorgement, Plaintiffs also seek an award of punitive damages. *See* JSR [Dkt. No. 85] at 5. Defendants are entitled to judgment on this claim.[12]

As noted *supra*, the remedy of disgorgement "may not be used punitively." *See, e.g.*, *First City Fin. Corp.*, 890 F.2d at 1231. Notwithstanding this maxim, the punitive nature of equitable disgorgement cannot be ignored. And this is particularly so here.

---

[12] The question of whether punitive damages are available to a plaintiff is one that is ripe for summary adjudication as the Court must play a gatekeeping role "to determine, upon a defendant's challenge to the sufficiency of the evidence . . .whether there is competent evidence upon which a reasonable jury could find reckless disregard, from which malice and evil intent may be inferred." *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1106 (Okla. 2005).

The disgorgement Plaintiffs seek is, as they concede, not intended to compensate or put Plaintiffs back in the same position they would have been in absent the alleged trespass. It is instead designed to strip Enable of a benefit Plaintiffs could not have enjoyed themselves. *See* Deposition Transcript of Gray [Ex. "24"] at 19:8-13. That is to say, because Plaintiffs could not operate a natural gas pipeline system, the disgorgement they seek is not intended to compensate Plaintiffs for damages they have suffered. Rather, the disgorgement Plaintiffs seek is intended to strip Enable of an allegedly ill gotten gain. And in this regard, the disgorgement sought is punitive in nature; *i.e.*, designed to punish Enable and disincentive future conduct. *See, e.g., Everbrite Elec. Signs, Inc. v. Yezzi*, 144 Wis. 2d 949 (Wis. Ct. App. 1988) ("The sanction resulting in disgorgement of profits is in effect restitutional and not compensatory and is distinct from the sanction involving compensation for actual damages suffered. Profits must be returned irrespective of the actual loss to the principal. It is punitive because it forces the [defendant] to give up his profits even when his actions may not have resulted in any monetary loss to [the plaintiff]. Any award in excess of actual damages is punitive in nature.").

Of particular note, Plaintiffs seek to disgorge not merely the incremental gain to Enable of the alleged trespass, but instead the gross revenues received (not net of expenses) **and** (for the reasons discussed above) duplicative "benefits" related to deferred costs of removing and rerouting the Subject Pipeline. If Plaintiffs were to be awarded this type of disgorgement, the punitive nature of the recovery would become all the more apparent. And because there is already a punitive component to the disgorgement Plaintiffs seek, if disgorgement is awarded, no further punitive damages should be allowed.

Beyond all this, there is no basis for an award of punitive damages in this case. In Oklahoma a jury may award punitive damages if it finds by **clear and convincing evidence** that "[t]he defendant has been guilty of **reckless disregard for the rights of others**," Okla. Stat. Ann. tit. 23, § 9.1(B)(1), or "acted **intentionally and with malice towards others**," *id.* § 9.1(C)(1), (D)(1) (emphasis added). The Oklahoma Supreme Court has interpreted § 9.1 to require evidence of "reckless disregard toward another's rights from which malice and evil intent may be inferred." *Badillo*, 121 P.3d at 1106. One acts with reckless disregard if he "was either aware, or did not care, that there was a substantial and unnecessary risk that [his] conduct would cause serious injury to others." OUJI (Civil) 5.6. Further, the conduct "must have been unreasonable under the circumstances, and also there must have been a high probability that the conduct would cause serious harm to another person." *Id.*; *see also Black v. M & W Gear Co.*, 269 F.3d 1220, 1239 (10th Cir.2001). None of these circumstances are present in the facts of this case.

The standard for punitive damages under federal law is quite similar. Under the federal common law, "[w]henever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person." *Philadelphia, W., & B.R. Co. v. Quigley*, 21 How. 202, 214 (1859); *see also Reed v. Aaacon Auto Transp., Inc.*, 637 F.2d 1302, 1307 (10th Cir. 1981), *overruled on other grounds by Underwriters at Lloyds of London v. N. Am. Van Lines*, 890 F.2d 1112 (10th Cir. 1989), (explaining that punitive damages are recoverable under federal common law when carrier

acts with actual malice or reckless or wanton indifference to plaintiff's rights) (citing *Miller v. Aaacon Auto Transp., Inc.*, 447 F. Supp. 1201 (S.D. Fla. 1978).

Enable respectfully contends no reasonable jury could find (particularly by clear and convincing evidence) that Enable acted with the degree of culpability necessary to permit an award of punitive damages under either Oklahoma or federal law. In either circumstance, Plaintiffs would need to adduce evidence which clearly demonstrated that Enable acted recklessly, wantonly, and/or with malice and knew that by doing so Plaintiffs were at risk of grave or serious harm. No evidence adduced, however, supports such a conclusion.

After discovering that the original right-of-way easement for its recently acquired pipeline had expired, Enable took the step of seeking renewal. *See* UMF No. 5. Importantly, the renewal offer made by Enable was not arbitrary or below market, but was instead consistent with the going rate for easements and made pursuant to an appraisal that was signed off upon by the BIA. *See* UMF Nos. 6 - 7. Plaintiffs, for their part, rejected Enable's offer and demanded that for a 20-year easement under 0.011% of their property, Enable pay the appraised value to purchase the entire property. *See* UMF No. 10. Because the BIA did "not have authority to negotiate for a value exceeding the appraised value" of the easement, the BIA cancelled Enable's renewal application and levied a trespass assessment which Enable paid, and which the Plaintiffs accepted.[13] *See* UMF Nos. 11 - 15.

After paying the trespass assessment, Enable decided to seek condemnation– a right Enable had at the time – despite the fact it had never before pursued such an action on

---

[13] As noted, the amount of this trespass assessment was based on the appraisal's determination that $40 / rod for 20-years was a fair market value. *See* UMF No. 6. Plaintiffs accepted this payment and BIA considered any trespass issues for the period running from the expiration of the original right-of-way easement to the assessment's payment "resolved" by virtue of the payment and its acceptance by Plaintiffs. *See* UMF Nos. 14 - 15.

allotted Native American land. *See* UMF No. 16. Before Enable filed condemnation, however, the BIA urged Enable to refrain from doing so and to submit a new renewal application, which it did. *See* UMF No. 17. And documents indicate that application was granted and from 2008 until March of 2010 (when Director Deerinwater issued his opinion), a new right-of-way easement was in place. *See* UMF No. 19. And at or about the time this new easement was granted, a small fraction of the ownership of the Subject Property escheated to the Kiowa Tribe, stripping Enable of its right of condemnation according to this Court's Order. *See* UMF No. 20.

When the BIA reversed its decision in 2010, the parties were instructed to further negotiate and it was determined that only if such negotiations broke down, then Enable should, some time in the future, be instructed to vacate the Subject Property. *See* UMF No. 22. Communications between the parties in the following years were, however, minimal because Ms. Davilla "requested that the [BIA] not contact [Enable]" because the Plaintiffs "attorney . . . w[ould] be contacting [Enable] on [their] behalf." *See* UMF No. 23. Plaintiffs were, however, apparently unable to find an attorney to contact Enable on their behalf until the fall of 2015. *See* UMF No. 24. All the while, Plaintiffs **never** made a demand that Enable remove the Subject Pipeline. *See* UMF No. 25.

Enable openly and transparently dealt with the BIA and Plaintiffs and their predecessors for years, and it was not unusual for such negotiations to take extended periods of time. *See* UMF No. 28. Consequently, until it received Plaintiffs' demand letter in the late fall of 2015, Enable had a good faith reason to believe a renewal would eventually get done, and there is no evidence to the contrary. *See id.*

Based on the foregoing, Enable respectfully submits no reasonable jury could find (particularly by clear and convincing evidence) Enable was recklessly or wantonly acting in a manner that subjected the Plaintiffs at an unreasonable risk of grave or serious danger. Enable did not sneak on to Plaintiffs' property in the dark of night and surreptitiously encumber the Subject Property. Nor did the presence of the Subject Pipeline interfere with any use of the Subject Property. The facts were known to all parties at all times and the fact negotiations for a new tenancy ultimately were unsuccessful does not make Enable the type of bad actor that could be subjected to an award of punitive damages.

### C.   ANY COMPENSABLE TRESPASS ACCRUED NO EARLIER THAN 2006

Enable respectfully requests this Court determine that, at a minimum, any trespass that has occurred began no earlier than August 2006; the date on which Enable paid (and Plaintiffs accepted) a trespass assessment which "resolved" any trespass issues that had arisen prior to that point. *See* UMF Nos. 13 - 15. Based on the undisputed facts the Court (or a jury) could, either at the summary judgment stage or in trial, determine that any trespass accrued later – *e.g.*, following the 2010 opinion of Director Deerinwater (which granted Plaintiffs' appeal of the 2008 grant of an easement, and before which 2010 date Enable could not possibly have been on notice that it did not have a right to be on the Subject Property), or with the filing of this lawsuit (when arguably a demand to leave was made) – but no trespass could have possibly accrued prior to 2006 when Plaintiffs accepted funds that resolved any trespass that had previously occurred.

Respectfully submitted,

*/s/ John A. Kenney*
John. A. Kenney, OBA #4976
Michael D. McClintock, OBA #18105
Michael K. Avery, OBA #22476
**MCAFEE & TAFT**
**A PROFESSIONAL CORPORATION**
211 North Robison
Two Leadership Square, Tenth Floor
Oklahoma City, OK 73102
Telephone: 405/235-9621
Fax: 405/270-7212
Email: John.Kenney@mcafeetaft.com
Michael.McClintock@mcafeetaft.com
Michael.Avery@mcafeetaft.com

-and-

Stratton Taylor, OBA #10142
Toney D. Foster, OBA #16063
Clint Russell, OBA #19209
Kassie N. McCoy, OBA #31405
**TAYLOR, FOSTER, MALLETT, DOWNS,**
**RAMSEY & RUSSELL**
400 West Fourth Street
P.O. Box 309
Claremore, OK 74018
Telephone: 918/343-4100
Fax: 918/343-4900
Email: staylor@soonerlaw.com
tfoster@soonerlaw.com
crussell@soonerlaw.com
kmccoy@soonerlaw.com

**ATTORNEYS FOR DEFENDANTS**

31

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on this 2nd day of November, 2018, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following registrants:

Stephanie C. Hudson
**OKLAHOMA INDIAN LEGAL SERVICES**
4200 Perimeter Center Dr., Ste. 222
Oklahoma City, OK 73112

      -and-

Catherine F. Munson
Keith M. Harper
Kristalyn Kinsel
**KILPATRICK TOWNSEND & STOCKTON, LLP**
607 14th Street, N.W., Ste. 900
Washington, D.C. 20005

      -and-

Dustin T. Greene
Elizabeth L. Wiinters
**KILPATRICK TOWNSEND & STOCKTON, LLP**
1001 West Fourth Street
Winston-Salem, NC 27101

**ATTORNEYS FOR PLAINTIFFS**

*/s/ John A. Kenney*