**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| MARCIA W. DAVILLA *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Case No. CIV-15-01262-G** |
| | ) | |
| ENABLE MIDSTREAM PARTNERS, LP *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
AND BRIEF IN SUPPORT**

---

John. A. Kenney, OBA #4976
Michael D. McClintock, OBA #18105
Michael K. Avery, OBA #22476
**MCAFEE & TAFT A PROFESSIONAL CORPORATION**
Two Leadership Square, Tenth Floor
211 North Robison
Oklahoma City, OK 73102
Telephone: 405/235-9621
Fax: 405/270-7212
john.kenney@mcafeetaft.com
michael.mcclintock@mcafeetaft.com
michael.avery@mcafeetaft.com

March 25, 2019

# TABLE OF CONTENTS


MOTION……………………………………………………………………………1

BRIEF IN SUPPORT……………………………………………………………1

I. INTRODUCTION……………………………………………………………1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS……………………3

III. ARGUMENT & AUTHORITIES……………………………………………16

A. PLAINTIFFS SHOULD NOT BE AWARDED DISGORGEMENT………16

1. DISGORGEMENT IS NOT AUTOMATICALLY AWARDED UNDER FEDERAL LAW……………………………………17

2. BALANCING THE EQUITIES, DISGORGEMENT IS NOT AN AVAILABLE REMEDY………………………………17

B. PLAINTIFFS' SUGGESTED MEASURE OF DISGORGEMENT IS INCORRECT……………………………………………………25

C. PLAINTIFFS SHOULD NOT BE PERMITTED TO RECOVER PUNITIVE DAMAGES……………………………………30

D. PLAINTIFFS SHOULD NOT BE AWARDED ATTORNEYS' FEES…………34

E. NO DAMAGES OR DISGORGEMENT SHOULD BE AWARDED FOR ANY PERIOD OF TIME PRIOR TO 2006……………………35

IV. CONCLUSION……………………………………………………………35

# TABLE OF AUTHORITIES

## Statutes

Okla. Stat. Ann. tit. 23, § 9.1 ........................................ 32

## Cases

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
421 U.S. 240 (1975) ........................................ 34

*Am. Lung Ass'n v. Browner*,
884 F. Supp. 345 (D. Ariz. 1994) ........................................ 17

*Badillo v. Mid Century Ins. Co.*,
121 P.3d 1080 (Okla. 2005) ........................................ 30, 32

*Black v. M & W Gear Co.*,
269 F.3d 1220 (10th Cir. 2001) ........................................ 32

*Brown v. Plata*,
131 S. Ct. 1910 (2011) ........................................ 17

*California ex rel. State Lands Comm'n v. United States*,
457 U.S. 273 (1982) ........................................ 34

*eBay Inc. v. MercExchange*,
547 U.S. 388 (2006) ........................................ 17

*Everbrite Elec. Signs, Inc. v. Yezzi*,
144 Wis. 2d 949 (Wis. 1988) ........................................ 31

*Enable v. A 25 Foot Wide Easement*,
Case No. Civ-15-1250-HE (W.D. Okla.) ........................................ 20-21

*Gate Guard Servs., L.P. v. Perez*,
792 F.3d 554 (5th Cir. 2015) ........................................ 34

*Hammond v. Cty. Of Madera*,
859 F.2d 797 (9th Cir. 1988) ........................................ 22-24

*Holland v. Florida*,
130 S. Ct. 2548 (2010) ........................................ 16-17

*Home Sav. Bank, F.S.B. by Resolution Trust Corp. v. Gillam*,
952 F.2d 1152 (9th Cir. 1991)……………………………………………………...34

*Kansas v. Nebraska*,
135 S. Ct. 1042 (2015)…………………………………………………………...25

*Martin v. Comcast Cablevision Corp. of California*,
338 P.3d 107 (N.M. Ct. Ap. 2014)………………………………………………27

*Miller v. Aaacon Auto Transp., Inc.*,
447 F. Supp. 1201 (S.D. Fla. 1978)……………………………………………...32

*Montford and Co., Inc. v. S.E.C.*,
793 F.3d 76 (D.C. Cir. 2015)…………………………………………………….25

*Mullins v. Equitable Prod. Co.*,
2003 WL 21754819 (W.D. Va. July 29, 2003)…………………………………...26-27

*Nat'l Lead Co. v. Magnet Cove Bairum Corp.*
231 F. Supp. 208 (W.D. Ark. 1964)……………………………………………...24

*Nat'l Sec. Sys., Inc. v. Iola*,
700 F.3d 65 (3d Cir. 2012)……………………………………………………...17-18

*New York State Ass'n for Retarded Children, Inc. v. Carey*,
711 F.2d 1136 (2d Cir. 1983)……………………………………………………34

*Philadelphia W., & B.R. Co. Quigley*,
21 How. 202, 214 (1859)………………………………………………………..32-33

*Pub. Serv. Co. of N.M. v. Barboan*,
857 F.3d 1101 (10th Cir. 2017)…………………………………………………20-21

*Reed v. Aacon Auto Transp., Inc.*,
637 F.2d 1302 (10th Cir. 1981)………………………………………………….32

*S.E.C. v. First City Fin. Corp.*,
890 F.2d 1215 (D.C. Cir. 1989)………………………………………………….31

*SEC v. Maxxon, Inc.*,
465 F.3d 1174 (10th Cir. 2006)………………………………………………….16

*Starrh & Starrh Cotton Growers v. Aera Energy L.L.C.*,
153 Cal. App. 4th 583 (2007)…………………………………………….........25

*Texas E. Transmission L.P. v. 7 Acres of Land*,
2016 WL 6901324 (S.D. Tex. Nov. 22, 2016)…...27

*Towerridge, Inc. v. T.A.O., Inc.*,
111 F.3d 758 (10th Cir. 1997)…...34

*Underwriters at Lloyds of London v. N. Am. Van Lines*,
890 F.2d 1112 (10th Cir. 1989)….32

*United States v. Imperial Irr. Dist.*,
799 F. Supp. 1052 (S.D. Cal. 1992)…...24

*United States v. Pen Oreille Pub. Utility Dist. No. 1*,
28 F.3d 1544 (9th Cir. 1994)….24

*Valley Asphalt, Inc. v. Stimpel Wiebelhaus Assocs.*,
3 F. App'x 838 (10th Cir. 2001)…35

*Wall Sys., Inc. v. Pompa*,
154 A.3d 989 (Conn. 2017)…...17

*Watson v. United States*,
263 F. 700 (8th Cir. 1920)….24

*Zinaman v. Kingston Rg'l Sr. Living Corp.*,
2014 WL 282633 (N.D.N.Y. Jan. 23, 2014)…...17

**Other Authorities**

25 C.F.R. § 169.102……..5

25 C.F.R. § 169.114……..5

25 C.F.R. § 169.201…...3

Fed. R. Civ. P. 56…...1

OUJI (Civil) 5.6…...32

1 Dan B. Dobbs, Law Of Remedies (2d ed. 1993)…...17

Restatement (Third) of Restitution and Unjust Enrichment…26

## MOTION

Pursuant to Fed. R. Civ. P. 56, Defendants Enable Midstream Partners LP, Enable GP LLC, and Enable Oklahoma Intrastate Transmission LLC (collectively, "Enable") move the Court for an Order: (1) granting Enable summary judgment on Plaintiffs' request for an award of equitable disgorgement or, in the alternative, determining any disgorgement awarded should be measured not by revenues or profits earned by Enable, but instead by savings associated with the deferral of certain costs; (2) granting Enable summary judgment on Plaintiffs' claim for punitive damages; (3) granting Enable summary judgment on Plaintiffs' claim for attorneys' fees; and (4) determining Plaintiffs are not entitled to any relief associated with any complained of conduct which occurred before September 23, 2006. In support of its Motion, Enable submits the following brief.

## BRIEF IN SUPPORT

### I. INTRODUCTION

At issue in this lawsuit are approximately 1,270 feet of 20-inch natural gas pipeline that run beneath a tract of undeveloped land located in Caddo County, Oklahoma (the "Property"). The 1,270 feet of pipeline are, at present, owned by Defendant Enable Oklahoma Intrastate Transmission, LLC ("EOIT").[1] And the Property is a Native American allotment presently owned by the United States government, which holds it in trust for the benefit of Plaintiffs (the descendants of the original allottee, Millie Oheltoint, also known as Emaughobah) and the Kiowa Tribe of Oklahoma.

[1] EOIT, which is a Defendant in this lawsuit, is the successor-in-interest to Enogex, Inc., which was converted to Enogex, LLC in 2008 and became EOIT in connection with the formation of Defendant Enable Midstream Partners, L.P. in 2013. EOIT is part of this limited partnership.

The 1,270 feet of pipeline were laid under the Property pursuant to an easement granted by the United States, acting through the Bureau of Indian Affairs (the "BIA"), in 1980. That easement expired in 2000 and thereafter, EOIT's predecessor (which had acquired the easement in 1999) attempted to renew it via negotiations with Plaintiffs and the BIA. Plaintiffs were offered $3,080 for a renewed easement, which was the just compensation an independent appraisal determined was owed. Plaintiffs, however, demanded $63,600, an amount exceeding what the appraisal determined was the fair market value of the entire Property. As a result, no agreement was reached regarding renewal.

In August 2006, the BIA terminated Enable's renewal application and levied a trespass assessment on Enable for its use of the Property from the time the 1980 easement expired (*i.e.*, from 2000 to 2006). This assessment was in an amount equal to a 6-year pro-rated portion of the $3,080 the appraisal had determined was owed for a renewed 20-year easement. In September 2008, Enable paid and Plaintiffs accepted this amount. Later, in 2008, the BIA asked Enable to submit a new renewal application which was granted. That decision was appealed by some of the allotees and was reversed in 2010. There is no evidence Enable received notice of any of these proceedings.

It is undisputed that Plaintiffs did not, as part of the parties' negotiations or at any time prior to filing this lawsuit, demand EOIT remove its pipeline from the Property. The Tenth Circuit has affirmed this Court's ruling that even absent such a demand, at some point during the holdover tenancy the continued presence of the 1,270 feet of pipeline under the Property began to constitute a trespass given that the 1980 easement had expired.

In addition to seeking actual damages for this trespass, Plaintiffs also ask this Court to: (a) exercise its equitable powers and disgorge between $1.69 million and $2.49 million in benefits Plaintiffs say EOIT received as a result of the trespass; (b) award Plaintiffs' punitive damages; and (c) award Plaintiffs' their attorneys' fees. For the reasons set forth below, Enable should be awarded summary judgment on all three (3) of these requests for relief. And moreover, Enable should be awarded summary judgment on any claim for relief which relates to a period of time prior to September 23, 2006; the date on which Enable paid and Plaintiffs accepted an assessment levied by the BIA for any trespass that had occurred prior to that point.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

1. The Property consists of 136.25 acres of land held in trust by the United States for the benefit of Plaintiffs and the Kiowa Tribe of Oklahoma. *See* JSR [Dkt. No. 85] at 3 (Stipulated Fact No. 1); *id.* at 4 (Stipulated Fact No. 9).

2. On November 19, 1980, the United States, acting through the BIA, granted a 20-year right-of-way easement under 0.73 acres of the Property to Producer's Gas Company ("Producer's"). *See id.* at 3-4 (Stipulated Fact No. 2); *see also* [Ex. "1"].

3. When granting right-of-way easements over Native American allotments, the BIA "generally consider[s] a maximum duration of 20 years to be reasonable for the initial term for rights-of-way for oil and gas purposes . . . ." *See* 25 C.F.R. § 169.201(c).

4. Producer's laid 77 rods[2] (or approximately 1,270.57 feet) of 20-inch natural gas pipeline under the Property in and around 1980. *See* JSR [Dkt. No. 85] at 3-4 (Stipulated Fact No. 2); [Ex. "2"] (Enable's Ints. Resps.) at 4 (Resp. to Int. 3).

5. In and around 1999, Producer's successor-in-interest (TransOk) sold its stock to EOIT's predecessor (Enogex, Inc.). *See* JSR [Dkt. No. 85] at 3-4 (Stipulated Fact No. 2); [Ex. "3"] (Purchase Agreement) (for purposes of judicial economy and because it is "Confidential," only the cover and signature pages of this Purchase Agreement are attached).

6. Until recently, the 77 rods of pipeline were part of a larger 2,200 mile long intrastate system that stores and transports natural gas and is owned and operated by EOIT.[3] *See* [Ex. "4"] (Enable 10-K for 2016) at 5, 10-11, and 15.

7. Because Enogex's purchase of TransOk "was an extremely large acquisition" and "there wasn't an actual assignment [of individual assets] taking place" given that it was a stock, rather than asset purchase, Enogex did not review each and every one of TransOk's tens of thousands of easement files, all of which were kept in paper form. Instead, and as is typical in such transactions, Enogex reviewed a sample of the tens of thousands paper easement files prior to closing. *See* [Ex. "6"] (Deposition of Enable Right-of-Way Director Brian Green) at 20:2-12; 21:5-8; 28:3-21.

8. At the time of its purchase of TransOk, Enogex had an electronic database created by the company's right-of-way director, Mr. Green, that catalogued the company's easement files. *See id.* at 28:8-21.

[2] A rod is a unit of measurement used in surveys equal to 16.5 feet.

[3] As of November 30, 2018, EOIT has ceased use of the 77 rods. *See* [Ex. "5"] (Soell Declaration).

9. After Enogex acquired TransOk, it "had a room full of boxes of paper and [the company] hired contractors to come in sheet by sheet and put [the easement data] into [the company's electronic] database, which took a length of time." *See id.* at 28:15-21.

10. This work was made more difficult by the fact that TransOk had an "almost nonexistent record-keeping system of real property documents," "which was problematic . . . in . . . absorbing the assets" by Enogex. *See id.* at 21:5-8; 28:8-14.

11. It took Enogex approximately "[e]ighteen to 24 months from the time [it] closed" on its acquisition of TransOk to upload the data from the paper easement files to Enogex's electronic database. *See id.* at 29:12-17.

12. When Enogex "got all the records in 18 to 24 months after closing, [it] then had the tool to find out" that the 1980 easement over the Property it had acquired had expired after TransOk's stock had been acquired. *See id.* at 29:20-30:2.

13. "[A]s soon as [Enogex] had th[e] tool available[,]" to discover the 1980 easement had expired, it "started th[e] process" of "submit[ing] to the BIA for the renewal" of the easement. *See id.* at 30:2-5; 30:21-31:7; 32:6-9.

14. Pursuant to applicable federal regulations, Enogex was required to commission an appraisal to determine the just compensation that would be owed for a renewed easement. *See* 25 C.F.R. §§ 169.102(b)(6) and 169.114.

15. Enogex hired Carmen Farnbach, an independent appraiser properly authorized by the BIA, to conduct this appraisal. *See* [Ex. "7"] (Appraisal).

16. On April 17, 2002, Ms. Farnbach produced her appraisal which, after reviewing comparable sales, concluded the entire 136.25 acres of the Property was worth $63,000. *See id.* at (BIA_077).

17. Ms. Farnbach went on to conclude the just compensation owed for a renewed 20-year easement under the Property was $3,080 or $40 per rod. *See id.* at (BIA_115).

18. In reaching her conclusion regarding the $40 per rod just compensation figure, Ms. Farnbach examined nine (9) other easements acquired over allotted Native American lands during the relevant time period, all of which were granted for the same $40 per rod. *See id.* at (BIA_112-15).

19. Ms. Farnbach's methodology and conclusions were approved by the BIA's Office of Special Trustee ("OST"), whose review of her work was done "to assure that [the appraisal w]as supported by objectively selected and adequately documented data that is logically analyzed to obtain a reasonable conclusion of value and [met] the requirements of [the Uniform Standards of Professional Appraisal Practice]." *See id.* at (BIA_126-27).

20. The $40 per rod Ms. Farnbach concluded was the just compensation for a renewed 20-year easement on the Property was, at the time, "the going rate for . . . buying new right-of-way for private landowners" who can grant perpetual easement that, unlike BIA easements, do not expire and need to be renewed. *See* [Ex. "6"] (Green Depo.) at 46:19-47:1.

21. Term easements are less valuable to a pipeline company than perpetual easements given that the former eventually expire and have to be renewed. Because of the complexities and other logistical issues related to obtaining these term easements from the BIA, however, Enogex (and now EOIT) routinely offers allottees the same price for term

easements as they do to private landowners for perpetual easements. *See* [Ex. "8"] (Brian Green Declaration) at ¶¶ 2-3.

22. One of the Plaintiffs, Mayredean Palmer (who worked for Phillips and DCP in their right-of-way departments), confirmed that during the early 2000s when Enogex sought renewal, $40 per rod was "what [pipeline companies] paid" for term easements from the BIA over allotted lands. *See* [Ex. "9"] (Palmer Depo.) at 11:7-25; 14:11-15:15.

23. On June 14, 2002, Enable submitted an application for a renewed 20-year easement under the Property offering $40 per rod. *See* [Ex. "10"].

24. After Enogex's application was submitted to the BIA, the BIA prepared a Title Status Report (or "<u>TSR</u>") that identified who the beneficial owners of the Property were so that Enogex could contact these individuals and seek consent for the renewed easement. *See* [Ex. "6"] (Green Depo.) at 33:25-34:4 ("At the time we submitted this application – the process at the [BIA] was you submitted this application, they then provided you with TSRs to identify who the landowners were to obtain consent from.").

25. It is not until the TSR was prepared by the BIA that Enogex had "the right to contact the owners" of the Property. *See* [Ex. "11"] (Deposition of Gib Miles, contract land man hired by Enogex) at 24:22-26:1 (explaining that after the application is submitted, "then you just sit and wait for [the BIA] to say, 'Okay. Here is the TSR,' title status report. And at that point, they give you the right to contact the owners, because we don't have the right to contact the owners until the [BIA] gives us that permission. So we can't do that on our own.").

26. The TSR for the Property was prepared on July 30, 2004. *See* [Ex. "12"] (TSR) (Enable 67-71); [Ex. "6"] (Green Depo.) at 36:11-37:13.

27. As Mr. Green has explained, "it is a very cumbersome process to go through the red tape to get the whole actual renewal done. So the fact that there[ was a] two-year lag between" Enogex's submission of its renewal application in June 2002 and the creation of the TSR in July 2004 did not "overly shock" Mr. Green who "had dealt with that in the past and [with] other[]" renewal applications. *See* [Ex. "6"] (Green Depo.) at 36:11-37:13.

28. Ms. Palmer also explained that "over the years, the BIA went through spells where they were very slow in getting -- . . . responses back." *See* [Ex. "9"] (Palmer Depo.) at 16:12-23.

29. Between August and December of 2004, at least five (5) of the consent forms sent to the beneficial owners of the Property were returned signed, indicating consent was given. *See* [Ex. "13"].

30. Marcie Davilla[4] has the largest beneficial ownership interest in the Property and is, according to other Plaintiffs, the matriarch of her family. *See* [Ex. "12"] (TSR); [Ex. "14"]; [Ex. "14"] (T. Blackstar Depo.) at 14:20-15:14.

31. On August 5, 2004, Ms. Davilla received a letter that "explained Enogex's offer of $3,080.00 ($40.00 per rod) met or exceeded the appraisal completed by the Office of Special Trustee's Office of Appraisal Services." *See* [Ex. "15"] at (Davilla00095) ("The August 5, 2004 letter you received . . . .").

[4] Marcie Davilla is referred to throughout this Motion as "Ms. Davilla." Ms. Davilla's daughter, LaDonna Davilla, is referred to as "LaDonna" so as to avoid any confusion.

32. Three days later, Ms. Davilla signed and returned her consent form indicating thereon that it was "VOID"; *i.e.*, that Ms. Davilla did not consent to the $40 per rod offer. *See* [Ex. "16"].

33. Approximately six (6) months later, on February 7, 2005, Ms. Davilla wrote a letter to the BIA requesting further information about Enogex's renewal application. *See* [Ex. "15"] at (Davilla00090).

34. On April 15, 2005, Ms. Davilla wrote another letter to the BIA "in which [she] requested information regarding the results of [the] appraisal." *See* [Ex. "15"] at (Davilla 92) ("Dear Ms. Davilla: This is to confirm receipt of your April 15, 2005 letter, in which you requested information regarding the results of an appraisal and the status of a certain pipeline right-of-way on the allotment of Emaugobah, Kiowa 84.").

35. On May 10, 2005, the BIA wrote in response to Ms. Davilla once more explaining the appraisal had been "forwarded to the [OST]" whose "review supported Ms. Farnbach's appraisal price of $3,080 ($40.00 per rod)." The BIA then "encourage[d] Ms Davilla and the other beneficial landowners] to finalize negotiations with [Enogex] and provide [their] written consent as soon as possible." *See id.* at (Davilla0092-93).

36. Ms. Davilla recalls receiving this May 2005 letter and when she did she focused on the quote that "[t]he July 18, 2002 review [by the OST] supported M[s]. Farnbach's appraisal price of $3,080 ($40.00 per rod)." Ms. Davilla, however, "did not accept it." *See* [Ex. "17"] (Davilla Depo.) at 47:14-20; 50:18-51:21.

37. Pursuant to the advice of "Mr. Terry Bruner of the Southern Plains Regional Office [of the BIA] to place in writing how much [she thought her] property is worth,"

Ms. Davilla wrote a letter on December 5, 2005 in which she rejected the offer that Enogex pay a total of $3,080 for a 20-year easement and demanded Enogex instead pay $63,600 or approximately $3,080 per year for each of the 20 years (Ms. Davilla's letter indicates her demand was premised on $3,080 a year for 20 years, but the actual demand was $63,600, not the $61,600 that results when $3,080 is multiplied by 20). The $63,600 demanded by Ms. Davilla was $600 more than Ms. Farnbach had concluded was the fair market value of the entire 136.25 acres of the Property. *See* [Ex. "15"] at (Davilla00096); [Ex. "18"] (Davilla Letter) (Davilla001426).

38. Ms. Davilla's daughter, LaDonna Davilla – who has power of attorney for Ms. Davilla in matters related to this lawsuit – has explained her mother's demand of $63,600 for a renewed 20-year easement was in line with what Ms. Davilla believed "non-Native landowners next door" were receiving for perpetual pipeline easements. *See* [Ex. "19"] (LaDonna Depo.) at 19:19-21:10; 37:4-38:11.

39. But as Mr. Green has explained, at the time non-native land owners were actually receiving the same $40 per rod for perpetual easements which was offered to Plaintiffs for a 20-year term easement. *See* UMF Nos. 20-21.

40. Some time after Ms. Davilla submitted her $63,600 demand to Enogex, she attended a Listening Conference held by the Indian Tribal Monitoring Association at which Ms. Davilla discussed with the BIA certain concerns she had with Enogex's application for a renewed 20-year easement. *See* [Ex. "15"] at (Davilla0095-96); [Ex. "19"] (LaDonna Depo.) at 42:16-43:9.

41. Following this meeting, the BIA once more wrote to Ms. Davilla in a letter dated April 13, 2006. Therein, the BIA addressed the issues raised by Ms. Davilla at the conference stating, *inter alia*: (a) Ms. Davilla incorrectly believed Enogex was "adding 20 inches to 6 inches of existing [pipe]line" and that instead Enogex sought "a new easement for the same exact size, a single buried 20 inch pipeline"; (b) Ms. Davilla had received multiple letters from the BIA explaining that Enogex's offer of $3,080 or $40 per rod was supported by Ms. Farnbach's appraisal and the OST's review of the same; (c) the BIA was aware of Ms. Davilla's demand of $63,600 for a renewed 20-year easement, but that the "Agency does not have authority to negotiate for a value exceeding the appraised value on the owner's behalf"; and (d) the BIA had "cancelled Enogex's application" and intended to levy a trespass assessment on Enogex in connection with the continued presence of the pipe under the Property after the 1980 easement expired. *See* [Ex. "15"] at (Davilla0095-96).

42. The BIA's termination of Enogex's application was effectuated through a letter sent to Mr. Green on April 13, 2006. *See* [Ex. "20"].

43. On August 24, 2006, the BIA levied the aforementioned trespass assessment, which was $1,098.35. This amount was calculated by taking the $40 per rod value for a 20-year easement and pro-rating it over a period of time beginning with the expiration of the 1980 easement and ending at the time of the assessment, and then adding interest. *See* [Ex. "21"].[5]

[5] As the BIA later explained, it should not have assessed Enogex for a trespass during the period of time which its renewal application was pending before the BIA; *i.e.*, between June 2002 and August 2006. *See* [Ex. "24"] at (Davilla0072-73). As a result, "Enogex paid four extra years of trespass fees." *See id.* at (Davilla0073).

44. On September 23, 2006, Enable paid this trespass assessment and the funds were distributed to the beneficial owners of the Property. *See* [Ex. "22"] (Check and Payment Coupon); *see also* [Ex. "23"] (Discovery Responses).

45. The BIA has stated that by virtue of Enogex's payment of this assessment "[t]he trespass ha[d] been resolved" through that point. *See* [Ex. "24"] at (Davillla0073).

46. On December 21, 2007, there was a meeting held at the Anadarko Agency of the BIA to continue to discuss Enogex's request for a renewed 20-year easement. This "was kind of a mediation, if you will, to try to find resolution to the [parties'] differences," but it was unsuccessful. *See* [Ex. "24"] at (Davilla0071); [Ex. "6"] (Green Depo.) at 42:18-43:3; 46:1-18; [Ex. "19"] (LaDonna Depo.) at 28:11-20; [Ex. "17"] (Davilla Depo.) at 85:11-20.

47. Enable was and is accustomed to BIA right-of-way negotiations "stretch[ing] out over a number of years to get renewed." Put otherwise, the company "had become accustomed to what on the outside would seem an abnormal delay in getting one done because there's many that take years and years to get across the finish line . . . ." *See* Ex. ["6"] (Green Depo.) at 49:7-19.

48. One of the contract land men with whom Enable works has had some BIA renewals take more than a decade; including "some that started in 2003 that were completed in 2016." *See* [Ex. "11"] (Miles Depo.) at 34:1-2.

49. Based on this experience, Enable and its agents always "really believed that [they] would be able to make a deal of some kind with [Plaintiffs] that was a little more reasonable than what had been thrown around." *See* [Ex. "25"] (Deposition of Enable Contract Land Man J. Coury) at 38:18-39:3.

50. Notwithstanding this optimism, in late 2007 Mr. Green "informed Steve Sullaway [of the BIA] that [Enogex was] going to file emanant [*sic.*] domain to obtain the renewal." *See* [Ex. "6"] (Green Depo.) at 48:1-7.

51. Mr. Green communicated this decision to Mr. Sullaway in telephone calls which took place on or about January 30 and 31, 2008. *See* [Ex. "26"].

52. The BIA communicated Enogex's decision to condemn to the beneficial owners of the Property who "were given the opportunity, which they refused, to call Enable regarding possible settlement." *See* [Ex. "24"] at (Davilla0071).

53. Thereafter, the BIA wrote Mr. Green a letter on February 15, 2008 in which it "extend[ed] the opportunity in writing for Enogex to submit a [new] Right-of-Way application for [the BIA's] review." The BIA went on to explain that "[a]lthough [it could not] guarantee approval of an easement at th[at] date, [it] would like to explore all possible avenues to prevent the removal of the pipeline or condemnation action." *See* [Ex. "26"].

54. It was "[n]ot [Enogex's] desire" to file for condemnation, and the company had not previously sought to condemn an easement on a Native American allotment. *See* [Ex. "6"] (Green Depo.) at 48:3-7; 63:1-14.

55. On May 23, 2008, Enable re-submitted its renewal application. *See* [Ex. "27"].

56. Approximately six (6) months later, 0.009% of the beneficial ownership of the Property escheated to the Kiowa Tribe of Oklahoma pursuant to federal statute. *See* [Ex. "28"] (Neumiller Report) at 7 (interest passing to Tribe on or about 11/25/2018).[6]

[6] Enable lost the right to condemn an easement based on this escheatment. *See Pub. Serv. Co. of N.M. v. Barboan*, 857 F.3d 1101 (10th Cir. 2017).

57. On June 23, 2008, the BIA sent a letter to the beneficial owners of the Property indicating it had approved Enogex's renewal application. *See* [Ex. "29"].

58. This approval was, however, never sent to Enogex, who had no knowledge of it. *See* [Ex. "29"] (Letter) (the certificate of service of this letter shows it was mailed only to the landowners and not to Enogex); [Ex. "6"] (Green Depo.) at 58:6-8 ("Q. . . . You were not even aware that the BIA had approved the renewal in 2008? A. Correct.").

59. Upon receipt of the approval, Ms. Davilla and several other beneficial owners of the Property filed an appeal to the next highest office of the BIA. *See* [Ex. "15"].

60. Enogex did not submit any response to this appeal because the company was never made aware of its filing. *See* [Ex. "6"] (Green Depo.) at 59:6-13.

61. On March 23, 2010, Regional Director Dan Deerinwater of the BIA granted the appeal. After concluding that Enogex's renewal application should not have been granted, Director Deerinwater "remand[ed] th[e] case for further negotiation" explaining that only if "a right of way for th[e] tract [wa]s not timely secured, [should Enable] be directed to move the pipeline off the subject property."[7] *See* [Ex. "24"] at (Davilla0073).

62. Enogex was never made aware of this decision. *See* [Ex. "6"] (Green Depo.) at 59:1-20.

63. In the wake of Director Deerinwater's command for further negotiations, Ms. Davilla wrote a letter to the BIA instructing that the agency "not contact Enogex."

[7] This action was consistent with 25 C.F.R. § 169.410 which states that the BIA will not consider a holdover tenant to be trespassing so long as the parties are continuing to negotiate regarding a renewal right-of-way easement.

Ms. Davilla explained that beneficial owners of the Property had retained counsel that would contact the company on their behalf. *See* [Ex. "30"].

64. The BIA acknowledged receipt of Ms. Davilla's letter and indicated it would "await for a response from [Ms. Davilla] or [her] attorney." *See* [Ex. "31"].

65. Over the next several years, Ms. Davilla and her family were unable to find a lawyer to contact Enogex on their behalf. *See* [Ex. "19"] (LaDonna Depo.) at 61:17-62:12; 63:7-63:14 ("Q. Okay. So you said Mr. Gonzales, to your understanding, to you that he wasn't going to be able to help? A. Correct. Q. And it's my understanding that, then, there was an effort to find additional legal counsel? A. Yeah. Q. okay. Over – A. Like 10 different efforts . . . Q. . . . [D]o you know whether or not any of those individuals with whom you all spoke ever contacted Enogex? A. No, none of them ever contacted Enogex . . . .").

66. Some time prior to the filing of this lawsuit, Plaintiffs met and retained the counsel which now represents them. *See* [Ex. "17"] (Davilla Depo.) at 89:20-91:15.

67. In August 2015, this counsel sent a letter to Enable indicating Plaintiffs intended to file a lawsuit based on an alleged trespass, but also invited a discussion of a potential settlement of the matter. *See* [Ex. "32"] (D. Smith Letter).

68. Neither this letter nor any other prior communication from Plaintiffs to Enable or the BIA demanded the pipeline be removed from the Property. *See* [Ex. "19"] (LaDonna Depo.) at 63:11-25 ("Q. . . . [D]o you know whether or not any of those individuals with whom you all spoke ever contacted Enogex? A. No, none of them ever contacted Enogex that I know of."); *id.* at 64:16-65:13 ("Q. Even to make a demand that

they leave? A. No. We did not do that. We should have. That's what we should have done. That's where we booboo'd at. We made a bad mistake there.").

69. Though it would not have been optimal to do so, EOIT could serve all the company's existing customers without use of the 77 rods under the Property and there is no evidence to the contrary for any relevant period of time. *See* [Ex. "33"] (Deposition of Enable's Director of Western Division Field Operations P. Soell) at 28:12-17.

70. And the presence of the pipe under the Property has never interfered with Plaintiffs' ability to use the property for any purposes which they wished. *See, e.g.*, [Ex. "34"] (B. Blackstar Depo.) at 54:1-21; [Ex. "14"] (T. Blackstar Depo.) at 47:7-48:12.

## III. ARGUMENT & AUTHORITIES

### A. PLAINTIFFS SHOULD NOT BE AWARDED DISGORGEMENT

On appeal, the Tenth Circuit affirmed this Court's ruling that the continued presence of the pipeline under the Property constitutes a trespass.[8] In addition to seeking actual damages for this trespass, Plaintiffs also ask this Court to exercise its equitable power to disgorge from Enable any benefit the company received from this trespass. Plaintiffs seek disgorgement in an amount between $1.69 million and $2.49 million.[9] *See* [Ex. "35"] (Gray Report) at 2. Plaintiffs' request for this equitable relief should be denied.

---

[8] Neither this Court nor the Tenth Circuit has established when the trespass began; whether in 2000 (when the 1980 easement expired); 2006 (when Plaintiffs received the trespass assessment levied by the BIA); 2010 (when the BIA apparently reversed course on its prior grant of a new easement; 2015 (when this lawsuit was filed); or some later date.

[9] This amount is the aggregate of $1.33 million worth of benefit Plaintiffs say Enable received as the result of deferring the costs of removing and re-routing its pipeline during the trespass and either $1.16 million in revenues or $351,000 in operating profits Plaintiffs say Enable received as a result of its use of the 77 rods during the trespass.[9] *See id.*; *see also* [Ex. "36"] (Gray Deposition) at 20:14-21:2.

### 1. Disgorgement Is Not Automatically Awarded Under Federal Law

It is undisputed that federal law governs Plaintiffs' trespass claim. According to Plaintiffs, federal law *automatically* entitles them to an award of equitable disgorgement upon the finding of a trespass. *See, e.g.*, Motion [Dkt. No. 54] at 10-11. This is incorrect.

"Disgorgement is by nature an equitable remedy . . . ." *See SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006). And as the United States Supreme Court has explained, the "exercise of a court's equity powers. . . must be made on a case-by-case basis." *Holland v. Florida*, 130 S. Ct. 2549, 2563 (2010). Consistent with this, and as the Tenth Circuit observed, "the sheer right [of Plaintiffs] to exclude [others from the Property] simply cannot begin and end the equitable analysis." *See* [Ex. "37"] (10 CA Opinion) at 29-30 (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006)). That is to say, the fact that a trespass has occurred does not, in and of itself, justify an award of the equitable remedy of disgorgement. Rather, the Court must examine all the facts and "shape [its] relief 'to fit its view of the balance of the equities and hardships,' and . . . fashion relief tailored to the unique circumstances of [this] case." *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 102 (3d Cir. 2012) (quoting 1 Dan B. Dobbs, Law of Remedies § 2.4(1), at 92 (2d ed. 1993) (citing *Brown v. Plata*, 131 S. Ct. 1910, 1944 (2011)).

### 2. Balancing the Equities, Disgorgement Is Not An Available Remedy

"Summary judgment is appropriate where, as here, it remains only for the Court, acting in its discretion, to fashion an equitable remedy." *Am. Lung Ass'n v. Browner*, 884 F. Supp. 345, 346 (D. Ariz. 1994); *see also Zinaman v. Kingston Reg'l Sr. Living Corp.*, Civ. No. 1:11–

CV–388 (RFT), 2014 WL 282633, at *1 n.2 (N.D.N.Y. January 23, 2014) (explaining that entitlement to "equitable remedies . . . can be decided anytime including by summary judgment"). The Court's "equitable discretion is not[, however,] governed by fixed principles and definite rules. Rather, implicit therein is conscientious judgment directed by law and reason and looking to a just result." *See Wall Sys., Inc. v. Pompa*, 154 A.3d 989, 1001 (Conn. 2017). This, again, requires the Court to "shape [its] relief 'to fit its view of the balance of the equities and hardships,' and . . . fashion relief tailored to the unique circumstances of [this] case." *Iola*, 700 F.3d at 102. Applying this standard here, awarding the equitable relief of disgorgement to Plaintiffs is not warranted.

An appropriate starting point in balancing the equities of this case is an examination of any hardship Plaintiffs may have suffered as a result of the continued presence of the 77 rods under the Property after the expiration of the 1980 easement. There is no evidence the presence of the 77 rods under the Property ever interfered with any intended use of the Property by Plaintiffs. *See* UMF No. 70. And at no point prior to the filing of this lawsuit did Plaintiffs ever demand Enable remove the pipeline from the Property or instruct the BIA to make such a demand on their behalf. *See* UMF No. 68. Enable is mindful of and respects the right of landowners to exclude others from their property, but never received a communication from Plaintiffs calling for such action. Instead, negotiations were never terminated. These facts demonstrate that the scope of the detriment Plaintiffs have suffered does not support an award of equitable disgorgement.

Moreover, though Plaintiffs have suggested Enable was dilatory in discovering the expiration of the 1980 easement and/or otherwise acted in disregard of Plaintiffs' rights, this

is not so. Enogex could not review all of TransOk's tens of thousands of poorly kept paper easement files prior to the acquisition of TransOK. *See* UMF No. 7. After closing, Enogex worked to input data from these tens of thousands of paper files to an electronic database the company had developed. *See* UMF Nos. 8 - 12. As part of this work, Enogex learned for the first time that the 1980 easement over the Property had expired after TransOk had been acquired and began its attempt to obtain a renewed easement. *See* UMF No. 13.

Throughout this process, Enable acted reasonably under the circumstances, offering a market price for a renewed easement that was supported by an independent appraisal approved by the BIA's OST. *See* UMF Nos. 14 - 55. The BIA acknowledged Enable's offer reflected appropriate just compensation for the renewed easement and communicated this to Plaintiffs on multiple occasions. *See* UMF Nos. 19; 31; 35; 37; and 41. Accustomed to the fact it can take a protracted period of time to obtain easements from the BIA, Enable stuck with this process for years after making this offer, communicating and meeting with the BIA and the landowners. *See* UMF Nos. 14 – 55.

Rather than accept Enable's offer or negotiate for an incremental amount more than the market price offered, a majority of Plaintiffs, lead by Ms. Davilla, demanded Enable pay $63,600 for a renewed easement. *See* UMF No. 37. This demand exceeded the value of the entire Property as determined by the independent appraisal and was approximately 20 times more than what the appraisal found was the just compensation owed for a renewed easement. *See* UMF Nos. 15-18. Because Enable was unwilling to meet this demand, negotiations stalled in 2006, at which time Enable paid (and Plaintiffs received) the trespass

assessment levied by the BIA for the time the 77 rods had remained on the property after the expiration of the 1980 easement (*i.e.*, from 2000 to 2006). *See* UMF Nos. 42 - 45.

Thereafter, a meeting was held at the BIA in December 2007 to see if a deal could still be made. *See* UMF No. 46. No agreement was, however, reached. *See id.* And it was at this point that Enable, for the first time, chose to initiate a condemnation action on a Native American allotment. *See* UMF Nos. 50-51.

Because no portion of the beneficial ownership of the Property had yet escheated to the Kiowa Tribe at this time, Enable had the right to pursue condemnation when it decided to do so in early 2008. See UMF No. 56; *Pub. Serv. Co. of N.M. v. Barboan*, 857 F.3d 1101 (10th Cir. 2017) (ruling that condemnation is not available if any portion of the beneficial ownership of an allotment is owned by a tribe). But after learning Enogex intended to file condemnation, BIA Superintendent Betty Tippaconie, by letter, urged Enable not to do so and to instead re-submit its renewal application. See UMF No. 53. And Enable, which also sought to avoid condemnation if it could, submitted its renewed application in May of 2008. See UMF Nos. 54 - 55.

This was the last word Enable heard on this matter prior to 2015. *See* UMF Nos. 58; 60; 62; and 67. Though this protracted period of silence was not unusual based on Enable's previous experiences with the BIA, *see* UMF Nos. 47 - 49, during this time and unbeknownst to Enable, the BIA had apparently granted the company a renewed easement, later reversed its decision, and instructed Plaintiffs to further negotiate with Enable on a higher price than what had been offered, *see* UMF Nos. 57; 59; 61; and 63. Plaintiffs, however, chose not to

heed the BIA's mandate, and also instructed the BIA not to contact Enable on their behalf. *See* UMF Nos. 63-65.

For the next five years, Plaintiffs unsuccessfully attempted to find a lawyer to represent them, all the while no one reached out to Enable, which believed its 2008 application was still pending before the BIA. *See* UMF Nos. 63 - 65. When Plaintiffs found a lawyer who reached out to Enable in 2015, Enable, which had all along believed the BIA was still considering the renewal application submitted in 2008, rekindled its plan to condemn an easement, rather than try to negotiate with landowners who previously made out-of-market demands. *See Enable Oklahoma Intrastate Transmission, LLC v. A 25 Foot Wide Easement*, Case No. Civ-15-1250-HE. Unbeknownst to Enable, however, just 6 months after it had (at the BIA's urging) passed up the opportunity to file a condemnation action in early 2008, 0.009% of the beneficial ownership of the Property escheated to the Kiowa Tribe, stripping Enable of the right to condemn. *See* UMF No. 56 *Barboan*, 857 F.3d 1101.[10] This put Enable in an unenviable position.

Throughout the course of its dealings with Plaintiffs and the BIA, no one had ever asked or demanded Enable remove the 77 rods from the Property. And Enable had, at the BIA's urging, abandoned its imitative to condemn an easement at the time the law would have allowed this to occur. By the time Plaintiffs contacted in Enable in 2015, the company could have paid for a renewed easement at the inflated and out-of-market price demanded by landowners whose property was not subject to condemnation. But even if it had done so,

[10] The Tenth Circuit's decision in *Barboan* was issued after Enable initiated its condemnation action in 2015. Prior to the decision in *Barboan*, there was not settled case law in our circuit concerning whether beneficial ownership by a tribe prevented condemnation of an easement over a Native American allotment.

the company still would have faced a lawsuit in which the landowners would take the position that although they had never asked the company to remove its pipeline from the Property, had never had their use of the Property interfered with by the presence of the pipeline, and had participated in the BIA renewal process for more than two decades, they are entitled to over $1.5 million in benefits Enable allegedly received during this period.

Against this backdrop, the balancing of equities demonstrates that disgorgement should not be awarded in this case. Because the pipeline never interfered with Plaintiffs' use of the Property and Plaintiffs never asked Enable to leave prior to filing this lawsuit, *see* UMF Nos. 68 and 70, it is difficult to determine how it could be said that Plaintiffs have suffered substantial hardship as a result of the trespass. *See* [Ex. "37"] 10CA Opinion at 30 (noting that Plaintiffs "do not explain how the pipeline's presence works 'irreparable harm'") *id.* at Concurrent (J. Hartz) at 3 (noting that "removal of the pipeline apparently would not benefit the landowners"). And moreover, though Plaintiffs persisted with an out-of-market $63,600 demand, Enable consistently dealt with the BIA and with Plaintiffs in a reasonable manner given the circumstances, all the while expecting that, as had always been the case, a deal would be struck even if it took a long time to get there. *See* UMF Nos. 14 - 55.

In addition to the foregoing, it should also be noted that at the BIA's urging, Enable forwent the right to condemn an easement on the Property at a time when it had a legal right to seek this relief. In early 2008 Enable, which had never before sought to condemn an easement on a Native American allotment, felt it had no other option based on Ms. Davilla's out-of-market $63,600 demand. The BIA, however, talked Enable out of this decision. Then, only months in to the agency's consideration of Enable's re-submitted renewal application,

Enable lost the right to condemn when a small portion of the beneficial ownership of the Property escheated to the Kiowa Tribe by operation of law. This set of circumstances also counsels against an award of equitable disgorgement. Indeed, to award the remedy of disgorgement would be tantamount to penalizing Enable for its forbearance from resorting to the path of condemnation when it had a legal right to do so.

Finally, and importantly, if Plaintiffs are awarded the disgorgement they seek – *i.e.*, all benefits Plaintiffs say Enable enjoyed over a protracted period of time during which Plaintiffs were well aware of the presence of the 77 rods of pipeline under the Property yet never demanded Enable remove the pipe or filed a lawsuit – this "would effectively compensate [them] for delaying the filing of this action." *Hammond v. Cty. of Madera*, 859 F.2d 797, 804 (9th Cir. 1988). Given it is an equitable remedy they seek, Plaintiffs should not be "encourage[d] . . . to intentionally refrain from filing suit until such time as [Enable] has amassed huge profits flowing from alleged misconduct. Such delay and unjust enrichment cannot be rewarded." *Id.*

The *Hammond* decision helps illustrate why a balancing of equities counsels against an award of disgorgement to Plaintiffs. The plaintiffs in *Hammond* were, like Plaintiffs here, the beneficial owners of an Indian allotment. They sued a county government alleging it had trespassed over the allotment in connection with the construction of a road. And in connection with this claim, the plaintiffs sought to disgorge the amount of increased tax revenues the county received from a subdivision that was developed based on the ability to access land via the trespassing road.

The Ninth Circuit concluded such "profits" were not properly recoverable and that instead, "[c]ommon law principles . . . indicate[d] that reasonable rental value [wa]s the appropriate remedy for [the] trespass." *See* 859 F.2d at 804. In reaching this conclusion, the *Hammond* court observed the plaintiffs had not actually been damaged by the construction of the subdivision and/or the increased revenues the county was able to realize as a result of its construction. Specifically, the court noted that "since [the plaintiffs] never owned the . . . subdivision and thus had no right to develop it, an award of damages in the amount of revenues from the subdivision would constitute a windfall for the plaintiffs." *Id.* The *Hammond* court found the situation was the same as where damages from a trespassing mining company are limited to lease value where the landowner is without the ability to develop the minerals in question. *See id.* (citing *Nat'l Lead Co. v. Magnet Cove Barium Corp.*, 231 F. Supp. 208 (W.D. Ark. 1964)).[11]

Likewise here, the only detriment Plaintiffs have suffered by virtue of the trespass has been the inability to collect easement revenues (either from Enable or another party) for use of the subsurface of the Property. *See* UMF No. 70; *accord* [Ex. "37"] (10CA Opinion) at 30 (noting that Plaintiffs "do not explain how the pipeline's presence works 'irreparable harm'"). There is no evidence that the presence of the pipe has interfered with any of

[11] A landowner without the right or ability to develop minerals is not damaged by the profits another party receives by developing these minerals. Instead, the landowner is only damaged by the lost opportunity to lease his land to a mineral developer or another party. *See id.*; *see also Watson v. United States*, 263 F. 700 (8th Cir. 1920) (holding that rental value, not rents and profits, was the proper measure of damage for trespass over Osage Indian Allotments held in trust by the United States);*United States v. Pend Oreille Pub. Utility Dist. No. 1*, 28 F.3d 1544, 1551 (9th Cir. 1994) (requiring a trespassing utility to reimburse a tribe only for the most profitable use of the tribe's property which the tribe was denied the opportunity to realize as a result of the trespass); *United States v. Imperial Irr. Dist.*, 799 F. Supp. 1052, 1066 (S.D. Cal. 1992) ("The parties agree that the proper measure of damages for trespass is the fair rental value of the property, assuming that the property is being put to its highest and best use.") (citing *Hammond*).

Plaintiffs' intended uses of the Property. *See* UMF No. 70. And there is no evidence Plaintiffs themselves would have used the Property to operate an intrastate natural gas pipeline system but for Enable already doing so. In consideration of these facts, and just as there was not *Hammond*, there is no basis for an award of disgorgement in this case and thus, Enable should be awarded summary judgment on this claim for relief.

### B. PLAINTIFFS' SUGGESTED MEASURE OF DISGORGEMENT IS INCORRECT

As explained *supra*, based upon a balancing of the equities in this case, Plaintiffs should not be granted an award of equitable disgorgement. But even if the Court were to determine an award of disgorgement was warranted, this does not mean Plaintiffs should receive the entire $1.69 million and $2.49 million they seek. "[D]isgorgement need not be all or nothing." *See Kansas v. Nebraska*, 135 S. Ct. 1042, 1058 (2015). And as a result of this reality, "[b]alancing equities and hardships may lead the court to grant some equitable relief but not the full measure requested." *See id.* (internal quotation marks omitted).

Further, it is well established that any award of equitable disgorgement must be "directly linked to the wrongful trespass." *See Starrh & Starrh Cotton Growers v. Aera Energy LLC.*, 153 Cal. App. 4th 583, 604 (2007). Put otherwise, because "[d]isgorgement deprives wrongdoers of the profits obtained from their violations," "the touchstone of a disgorgement calculation is identifying a causal link between the illegal activity and the profit sought to be disgorged." *Montford and Co., Inc. v. S.E.C.*, 793 F.3d 76, 83-84 (D.C. Cir. 2015) (internal quotation marks and alteration omitted). The amounts Plaintiffs seek to disgorge are not, however, causally linked to Enable's complained of conduct and thus, should not be awarded as a matter of law.

Plaintiffs' damages expert, James M. Gray, presents three (3) categories of benefit he contends are sufficiently linked to EOIT's trespass and could thus be disgorged: (1) revenues allegedly earned by using the 77 rods of pipe under the Property ($1,156,080); (2) operating profits allegedly earned by using the 77 rods of pipe under the Property ($351,330); and/or (3) money saved by deferring the cost of removing the 77 rods of pipeline from the Property and re-routing it over adjacent land ($1,334,955).[12] *See* [Ex. "35"] (Gray Report) at 2. According to Mr. Gray, a proper disgorgement award could consist of this third category (deferred cost savings) coupled with either the first or second (revenues or profits), which Mr. Gray acknowledges are mutually exclusive of one another (*i.e.*, that revenues and profits cannot both be awarded). *See* [Ex. "36"] (Gray Depo.) at 20:14-21:2.[13] When one bears in mind the fact that any award of disgorgement must be causally linked to the actual trespass, myriad problems with Mr. Gray's analysis emerge.

As an initial matter, though it would not have been optimal, EOIT could have operated its intrastate pipeline system without using the 77 rods of pipe under the Property. *See* UMF No. 69. As a result, there is no causal nexus between the trespass and any revenues or profits EOIT earned during any period in which the trespass occurred. Because this causal nexus is lacking, these categories of disgorgement should not be awarded to Plaintiffs

[12] As discussed at the Court's recent status conference, Mr. Gray intends to amend his report with regard to this third category of benefits he contends Enable received. The numbers set forth in Mr. Gray's report were premised on estimated costs to remove the pipe from and re-route it around the Property. Enable, which has now completed most of this work, is in the process of providing Plaintiffs information about the actual costs it incurred, which Mr. Gray will use to amend his report.

[13] Any award of revenues, rather than profits, would run afoul of the law of disgorgement, which permits the recovery of only "the **net profit** attributable to the underlying wrong." *See* Restatement (Third) of Restitution and Unjust Enrichment § 51(4) (emphasis added).

– a principle illustrated by the court's ruling in *Mullins v. Equitable Prod. Co.*, No. 2:03CV00001, 2003 WL 21754819 (W.D. Va. July 29, 2003).

The court in *Mullins* refused to disgorge profits associated with a trespassing pipeline and observed that, like here, the plaintiffs' "property was not the unique cause of any of [the defendant's] revenues." *See id.* at *4. Put otherwise, because "[n]one of the gas transmitted came from [the plaintiffs"] land and the evidence [wa]s that the [pipeline company's] business could have . . . been conducted without the use of [the landowner's] property," there was no causal link between the trespass and any revenues earned by the defendant. *See id.* As a result of this reality, there could be no disgorgement of revenues of profits in *Mullins*. *See id.*; s*ee also Texas E. Transmission,* 2016 WL 6901324, at *5 (S.D. Tex. Nov. 22, 2016) (noting that "[t]he Property Owners offer no authority, and the court can find none, for the proposition that they are entitled to disgorgement relief" against the pipeline company who operated under landowners' land with an expired easement); *Martin v. Comcast Cablevision Corp. of California*, 338 P.3d 107, 111 (N.M. Ct. App. 2014) (explaining that the benefits enjoyed by a trespassing line were not the result of using plaintiff's land but of the company's "business enterprise," meaning that the benefit to the company "is better understood as the savings it realized by using [plaintiff's] property without paying for the privilege").

So too here, it is undisputed that although it would not have been optimal, EOIT could have, at all relevant times, served its customers without use of the 77 rods of pipeline under Plaintiffs" Property. *See* UMF No. 69. Consequently, there is no causal nexus between

the trespass and any revenues or profits allegedly earned by EOIT. Plaintiffs' request to disgorge the same should be denied as a matter of law.

In addition to the absence of the required causal nexus the manner in which Mr. Gray calculates the revenues and profits he says could be disgorged is also incorrect. Mr. Gray begins by taking the approximately 1,270 feet of pipeline at issue and dividing this number by the approximately 2,200 miles of EOIT's pipeline system, resulting in a fraction of 0.011%. *See* [Ex. "35"] (Gray Report) at 3-5. Mr. Gray then multiples this fraction by the overall revenues and operating profits he says EOIT has earned across its entire system after the 1980 easement over the Property expired, resulting in figures of approximately $1.15 million (revenues) and $350,000 (profits). *See id.*

By "ratably reducing [EOIT's] revenue [and profits] by the length of the pipe [under the Property] as compared to [EOIT's] overall system," [Ex. "36"] (Gray Depo.) at 23:9-17, Mr. Gray cannot link any particular revenue or profit earned to the actual use of the 77 rods of pipe in question. He assumes each segment of pipe is used as much as any other segment of pipe and applies a fraction to EOIT's overall revenues and profits. But this type of *ad hoc* apportionment fails to establish the required nexus between what Plaintiffs seek to disgorge and any incremental benefit Enable actually enjoyed as a result of its actual use of the 77 rods of pipe in question. *See, e.g.*, *Starrh*, 153 Cal. App. 4th at 604-05 (noting that because a "link" is required, "[i]t is not enough to simply measure the profits earned in any given time period or proportion them to a particular part of the trespasser's business"). This, too, defeats Plaintiffs' request to disgorge revenues and/or profits of Enable.

Because there is no causal nexus between the trespass and revenues or profits earned, Enable respectfully contends that if any disgorgement is awarded, it should, as explained by Dr. Paul Carpenter, be measured by any benefit the company received by virtue of delaying the costs of removing and re-routing its pipeline during the trespass. *See* [Ex. "38"] (Carpenter Report) at 10-11. To calculate this number, experts for both parties agree the following methodology is appropriate:

- Start with what Enable actually paid to remove and re-route the 77 rods of pipeline in 2018 and 2019;
- Deflate that figure back to when the trespass started; *i.e.*, determine how much these costs would have been had they been incurred when the trespass started;
- Calculate the interest Enable earned by deferring the expenditure of these costs until 2018 and 2019; and
- Then take the aggregate amount of money Enable had (the principal amount of the deflated deferred costs, plus the interest earned on the same) and subtract from it the amount of money Enable spent to remove and re-route the 77 rods of pipeline

*See* [Ex. "36"] (Gray Depo.) at 34:4-38:6; [Ex. "38"] (Carpenter Report.) at 10-11.[14]

By using this methodology, one can determine what, if any, actual benefit Enable received by leaving the 77 rods of pipeline under the Property during the time of the trespass. Enable estimates this amount to be between approximately $132,000 and $355,000, depending on when any trespass may have accrued or became compensable as a matter of law. *See* [Ex. "38"] (Carpenter Report) at 11. This is the only amount of benefit that could

[14] Mr. Gray concedes this methodology is correct, but suggests that instead of subtracting the actual costs incurred by Enable, the Court could instead subtract the principal amount of deflated costs Enable deferred. *See* [Ex. "36"] (Gray Depo.) at 37:2-21. This suggestion, however, ignores the reality of the fact Enable actually expended larger sums of money in 2018 and 2019 and would result in a windfall to Plaintiffs.

actually be linked to the trespass as required by the law, presuming an award of equitable disgorgement is warranted in the first place.

As a final note, Enable feels it is incumbent to explain why aggregating the deferred costs approach with revenues or profits Enable allegedly earned by using the 77 rods of pipeline should not be permitted. As Dr. Paul Carpenter has explained, when disgorgement is awarded, the goal is to recreate the world as though the trespass had never occurred; *i.e.*, to put Enable in the same position as it would have been had there been no trespass. If Enable were stripped of the benefit of deferring removal and relocation costs, it would be as though Enable had actually removed and relocated the 77 rods of pipeline at the time any trespass accrued. *See* [Ex. "38"] (Carpenter Depo.) at 39:16-40:18. And had Enable done so, it would not have used to the 77 rods to earn the revenues and/or profits Plaintiffs seek to disgorge. *See id.* As a result, an award of both the benefit of deferred costs and profits earned would not restore Enable to the position Plaintiffs say the company should have been (*i.e.*, put Enable back where it would have been without the trespass), but would instead be punitive and therefore, not permissible under the law.

In sum, disgorgement should not be an available remedy, but if the Court were to conclude disgorgement was potentially appropriate, the Court should nevertheless enter a summary judgment ruling ordering that only the benefit Enable received in deferring removal and rerouting costs can be awarded.

### C. PLAINTIFFS SHOULD NOT BE PERMITTED TO RECOVER PUNITIVE DAMAGES

In addition to seeking compensatory damages (presumably measured by the costs of rents not paid to Plaintiffs) and disgorgement, Plaintiffs also seek an additional award of

punitive damages. *See* JSR [Dkt. No. 85] at 5. Defendants are entitled to summary judgment on this claim.[15]

As explained *supra*, an award of disgorgement should not be given to Plaintiffs based on the facts of this case. However, were disgorgement to be awarded, it is important to note that this remedy "may not be used punitively." *See, e.g.*, *First City Fin. Corp.*, 890 F.2d at 1231. Notwithstanding this maxim, the punitive nature of any equitable disgorgement that might be awarded to Plaintiffs in this case here cannot be ignored.

The disgorgement Plaintiffs seek is, as they concede, not intended to compensate or put Plaintiffs back in the same position they would have been in absent the alleged trespass. It is instead designed to strip Enable of some benefit Plaintiffs could not have enjoyed themselves. *See* [Ex. "36"] (Gray Depo.) at 19:8-13. That is to say, because Plaintiffs could not operate a natural gas pipeline system, the disgorgement they seek is not intended to compensate Plaintiffs for damages they have suffered. Rather, the disgorgement Plaintiffs seek is intended to strip Enable of an allegedly ill gotten gain with the goal of deterring others in the future from taking the same actions Enable did. In this regard, the disgorgement sought is punitive in nature; *i.e.*, designed to punish Enable and disincentive future conduct. *See, e.g.*, *Everbrite Elec. Signs, Inc. v. Yezzi*, 144 Wis. 2d 949 (Wis. Ct. App. 1988) ("The sanction resulting in disgorgement of profits is in effect restitutional and not compensatory and is distinct from the sanction involving compensation for actual damages

[15] The question of whether punitive damages are available to a plaintiff is one that is ripe for summary adjudication as the Court must play a gatekeeping role "to determine, upon a defendant's challenge to the sufficiency of the evidence . . .whether there is competent evidence upon which a reasonable jury could find reckless disregard, from which malice and evil intent may be inferred." *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1106 (Okla. 2005).

suffered. Profits must be returned irrespective of the actual loss to the principal. It is punitive because it forces the [defendant] to give up his profits even when his actions may not have resulted in any monetary loss to [the plaintiff]. Any award in excess of actual damages is punitive in nature.").

Of particular note, Plaintiffs seek to disgorge not merely the incremental gain to Enable of the alleged trespass, but instead the gross revenues received (not net of expenses) **and** (for the reasons discussed above) duplicative "benefits" related to deferred costs of removing and rerouting the 77 rods of pipeline. *See* [Ex. "36"] (Gray Depo.) at 20:14-21:2. If Plaintiffs were to be awarded this type of disgorgement, the punitive nature of the recovery would become all the more apparent. And because there is already a punitive component to the disgorgement Plaintiffs seek, if disgorgement is found to be warranted here, no further punitive damages should be allowed.

Beyond all this, there is no basis for an award of punitive damages in this case. In Oklahoma a jury may award punitive damages if it finds by **clear and convincing evidence** that "[t]he defendant has been guilty of **reckless disregard for the rights of others**," Okla. Stat. Ann. tit. 23, § 9.1(B)(1), or "acted **intentionally and with malice towards others**," *id.* § 9.1(C)(1), (D)(1) (emphasis added). The Oklahoma Supreme Court has interpreted § 9.1 to require evidence of "reckless disregard toward another's rights from which malice and evil intent may be inferred." *Badillo*, 121 P.3d at 1106. One acts with reckless disregard if he "was either aware, or did not care, that there was a substantial and unnecessary risk that [his] conduct would cause serious injury to others." OUJI (Civil) 5.6. Further, the conduct "must have been unreasonable under the circumstances, and also there must have been a high

probability that the conduct would cause serious harm to another person." *Id.*; *see also Black v. M & W Gear Co.*, 269 F.3d 1220, 1239 (10th Cir.2001). None of these circumstances are present in the facts of this case.

The standard for punitive damages under federal law is quite similar. Under the federal common law, "[w]henever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person." *Philadelphia, W., & B.R. Co. v. Quigley*, 21 How. 202, 214 (1859); *see also Reed v. Aaacon Auto Transp., Inc.*, 637 F.2d 1302, 1307 (10th Cir. 1981), *overruled on other grounds by Underwriters at Lloyds of London v. N. Am. Van Lines*, 890 F.2d 1112 (10th Cir. 1989), (explaining that punitive damages are recoverable under federal common law when carrier acts with actual malice or reckless or wanton indifference to plaintiff's rights) (citing *Miller v. Aaacon Auto Transp., Inc.*, 447 F. Supp. 1201 (S.D. Fla. 1978).

Enable respectfully contends no reasonable jury could find (particularly by clear and convincing evidence) that Enable acted with the degree of culpability necessary to permit an award of punitive damages under either Oklahoma or federal law. In either circumstance, Plaintiffs would need to adduce evidence which clearly demonstrated that Enable acted recklessly, wantonly, and/or with malice and knew that by doing so Plaintiffs were at risk of grave or serious harm. For the reasons discussed in § III(A), *supra*, the undisputed evidence does not support such a conclusion and thus, Enable should be awarded summary judgment on Plaintiffs' claim for punitive damages.

### D. PLAINTIFFS' SHOULD NOT BE AWARDED ATTORNEYS' FEES

In addition to the foregoing relief, Plaintiffs also seek an award of attorneys' fees in connection with their prosecution of this case. *See* Complaint [Dkt. No. 1] at 13 (prayer for relief (E). There is, however, no support in the law or facts for the granting of this relief. As a result, Enable should be awarded summary judgment on this issue.

As previously noted, the federal common law is applicable to Plaintiffs' trespass claim. And "[w]ith respect to non-statutory awards of attorney's fees, federal common law [does] exist[],"and it holds "that, absent an express statutory command, attorney's fees will not be awarded in civil cases." *See Home Sav. Bank, F.S.B. by Resolution Trust Corp. v. Gillam*, 952 F.2d 1152, 1162 (9th Cir. 1991) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975) (emphasis added); *see also Gate Guard Servs., L.P. v. Perez*, 792 F.3d 554, 559 (5th Cir. 2015) ("The general rule in federal courts and under the common law is that litigants are responsible for their own attorneys' fees."); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1140 (2d Cir. 1983) (explaining that the "Supreme Court [has ruled], with exceptions not pertinent to this case, that federal courts could not award attorney's fees absent explicit statutory authorization"). Here there is no statute entitling Plaintiffs' to attorneys' fees and thus, Enable should be awarded summary judgment on their request for the same. *See, e.g.*, *Gillam*, 952 F.2d at 1162 (declining to adopt a state law that would have allowed an award of attorneys' fees and explaining that "when federal common law already exists, as it does here, the Supreme Court has refused to apply state law" because

it "is not a case in which federal common law must be created") (citing *California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 284 (1982)) (emphasis in original).[16]

### E. No Damages or Disgorgement Should Be Awarded for Any Period of Time Prior to 2006

As noted *supra*, there has, to date, been no determination made concerning when the trespass began. Though this conclusion will need to be reached at some point in the future, Enable respectfully requests that at this summary judgment stage, the Court determine that regardless of when the trespass began, no relief should be awarded to Plaintiffs for any period of time prior to September 13, 2006; the date on which Enable paid and Plaintiffs received the trespass assessment levied by the BIA. *See* UMF No. 44. By accepting this payment, Plaintiffs resolved all trespass issues that pre-dated it. *See, e.g.*, *Valley Asphalt, Inc. v. Stimpel Wiebelhaus Assocs.*, 3 F. App'x 838, 840 (10th Cir. 2001) (explaining that "federal precedent[] and commentators have all made clear retention of a check offered as payment in full constitutes assent to the accord and satisfaction") (citations omitted).

## IV. Conclusion

For the reasons set forth above, Enable respectfully requests the Court grant its Motion for Partial Summary Judgment.

---

[16] There are three (3) exceptions to the general rule that attorneys' fees are not recoverable under federal common law, but none are applicable here. Two (2) of the these exceptions – where a plaintiff recovers a fund for the benefit of individuals who are not parties to the litigation and where the defendant willfully disobeys a court order – plainly do not apply. *See Alyeska*, 421 U.S. at 257. And the Tenth Circuit has explained the final exception, where a party acts in "bad faith," "reaches [only] to bad-faith conduct . . . occurring during the course of the litigation itself." *See Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 766 (10th Cir. 1997). There is no evidence or contention of any litigation conduct by Enable that was undertaken in bad faith.

Respectfully submitted,

*/s/ John A. Kenney*

John. A. Kenney, OBA #4976
Michael D. McClintock, OBA #18105
Michael K. Avery, OBA #22476
**MCAFEE & TAFT A PROFESSIONAL CORPORATION**
Two Leadership Square, Tenth Floor
211 North Robison
Oklahoma City, OK 73102
Telephone: 405/235-9621
Fax: 405/270-7212
Email: john.kenney@mcafeetaft.com
michael.mcClintock@mcafeetaft.com
michael.avery@mcafeetaft.com

-and-

Stratton Taylor, OBA #10142
Toney D. Foster, OBA #16063
Clint Russell, OBA #19209
Kassie N. McCoy, OBA #31405
**TAYLOR, FOSTER, MALLETT, DOWNS, RAMSEY & RUSSELL**
400 West Fourth Street
P.O. Box 309
Claremore, OK 74018
Telephone: 918/343-4100
Fax: 918/343-4900
Email: staylor@soonerlaw.com
tfoster@soonerlaw.com
crussell@soonerlaw.com
kmccoy@soonerlaw.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following registrants:

Stephanie C. Hudson
**OKLAHOMA INDIAN LEGAL SERVICES**
4200 Perimeter Center Dr., Ste. 222
Oklahoma City, OK 73112
hudson@oilsonline.org

-and-

Catherine F. Munson
Keith M. Harper
Kristalyn Kinsel
**KILPATRICK TOWNSEND & STOCKTON, LLP**
607 14th Street, N.W., Ste. 900
Washington, D.C. 20005
cmunson@kilpatricktownsend.com
kharper@kilpatricktownsend.com
kkinsel@kilpatricktownsend.com

-and-

Dustin T. Greene
Elizabeth L. Wiinters
**KILPATRICK TOWNSEND & STOCKTON, LLP**
1001 West Fourth Street
Winston-Salem, NC 27101
dgreene@kilpatricktownsend.com
bwinters@kilpatricktownsend.com

**ATTORNEYS FOR PLAINTIFFS**

*/s/ John A. Kenney*