# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

MARCIA W. DAVILLA *et al.*,          )
                                     )
            Plaintiffs,              )
                                     )
v.                                   )          **Case No. CIV-15-01262-G**
                                     )
ENABLE MIDSTREAM PARTNERS, LP        )
*et al.*,                            )
                                     )
            Defendants.              )

---

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

John. A. Kenney, OBA #4976
Michael D. McClintock, OBA #18105
Michael K. Avery, OBA #22476
**MCAFEE & TAFT A PROFESSIONAL CORPORATION**
Two Leadership Square, Tenth Floor
211 North Robinson
Oklahoma City, OK 73102
Telephone: 405/235-9621
Fax: 405/270-7212
john.kenney@mcafeetaft.com
michael.mcclintock@mcafeetaft.com
michael.avery@mcafeetaft.com

April 15, 2019

## TABLE OF CONTENTS

**INTRODUCTION**.................................................................................................1

**RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**............................3

**ARGUMENT & AUTHORITIES**...................................................................9

      I.    ANY TRESPASS ISSUES FOR THE PERIOD BETWEEN NOVEMBER 19, 2000 AND SEPTEMBER 13, 2006 HAVE BEEN RESOLVED AND PLAINTIFFS' SUMMARY JUDGMENT REQUEST TO BE ENTITLED TO TRESPASS REMEDIES FOR THIS PERIOD SHOULD BE DENIED.........................................................................11

      II.   BECAUSE ANY TRESPASS WAS TOLLED WHILE ENOGEX HAD A RENEWAL APPLICATION ON FILE AND/OR WAS OTHERWISE NEGOTIATING FOR A RENEWAL, PLAINTIFFS ARE ENTITLED ONLY TO FAIR MARKET RENTAL VALUE DURING THESE PERIODS AND PLAINTIFFS' SUMMARY JUDGMENT REQUEST FOR FURTHER RELIEF FOR THESE PERIODS SHOULD BE DENIED...................12

**CONCLUSION**..............................................................................................22

# TABLE OF AUTHORITIES

## Statutes

25 U.S.C. §§ 328……………………………………………………………………..13

## Cases

*Brown v. Plata*,
    131 S. Ct. 1910 (2011)…………………………………………………...18

*Enable v. A 25 Foot Wide Easement*,
    Case No. Civ-15-1250-HE (W.D. Okla.)………………………………..21-22

*Hammond v. Cty. Of Madera*,
    859 F.2d 797 (9th Cir. 1988)…………………………………….................18

*Holland v. Florida*,
    130 S. Ct. 2548 (2010)…………………………………………………...18

*Nat'l Sec. Sys., Inc. v. Iola*,
    700 F.3d 65 (3d Cir. 2012)………………………………………….........18

*Poafpybitty v. Skelly Oil Co.*,
    390 U.S. 365 (1968)……………………………………………………...14

*Pub. Serv. Co. of N.M. v. Barboan*,
    857 F.3d 1101 (10th Cir. 2017)………………………………………….22

*SEC v. Maxxon, Inc.*,
    465 F.3d 1174 (10th Cir. 2006)………………………………………….17

*Valley Asphalt, Inc. v. Stimpel Wiebelhaus Assocs.*,
    3 F. App'x 838 (10th Cir. 2001)………………………………………….11

## Other Authorities

25 C.F.R. § 169.201……………………………………………………......13

25 C.F.R. § 169.410………………………………………….1-2, 10-11, 15-16, 19

25 C.F.R. § 169.413……………………………………………………14-15

1 Dan B. Dobbs, Law Of Remedies (2d ed. 1993)………………………………...18

For their Response to the Motion for Partial Summary Judgment filed by Plaintiffs Marcia W. Davilla, *et al.* ("Plaintiffs") [Dkt. No. 135], Defendants Enable Midstream Partners LP, Enable GP LLC, and Enable Oklahoma Intrastate Transmission LLC (collectively, "Enable") state as follows

## INTRODUCTION

Plaintiffs' Motion asks the Court to "find that Enable's trespass commenced on November 19, 2000 and that Plaintiffs are entitled to recover at trial for the entire trespass period beginning on that date." *See* [Dkt. No. 135] at 21. Plaintiffs' argument is incorrect and invites the Court to avoid viewing the facts of this case through the lens of applicable federal regulations promulgated by the Bureau of Indian Affairs (the "BIA"), the logistical realities that lead to the enactment of these regulations, and the principles of equity which undergird them. Plaintiffs' request for relief should, therefore, be denied.

The undisputed facts show that as soon as it learned of the expiration of the original right-of-way easement, Enable began the process of seeking renewal and continued in its effort for years. Because BIA right-of-way easements are granted for 20-year terms, but are often used to lay utility or quasi-utility infrastructure intended to be utilized over a much longer period of time (in this case a natural gas pipeline), they must be renewed frequently. The BIA, however, often takes years to process renewal applications. Consequently, Enable's status as a holdover tenant participating in the process of trying to obtain a renewed right-of-way easement over a Native American allotment was not unique.

The BIA has enacted regulations that acknowledge this reality and dictate what is to occur in these circumstances. These regulations – most notably 25 C.F.R. § 169.410 –

indicate that so long as a holdover tenant is engaged in the renewal process and the landowners have not demanded it vacate the property, the tenant will not be forced to leave and will, for the holdover period, be charged the fair-market value of a right-of-way easement. This is consistent with the principles of equity and what should happen here.

Plaintiffs have, since the outset of this lawsuit, argued for more; saying that because it did not immediately vacate the Property upon the expiration of the original right-of-way easement granted to Producer's, Enable should, in equity, be disgorged of any economic benefit it received from its use of the Property after that date. This "all or nothing" remedial approach was rejected by the Tenth Circuit, which concluded that even though "the easement's expiration created a duty to remove the pipeline," Plaintiffs are not automatically entitled to an equitable injunction requiring the pipeline be removed because "the sheer right to exclude simply cannot begin and end the equitable analysis." *See* [Dkt. No. 136-37] at 18, 29-30. The same analysis applies in connection with Plaintiffs' request for an award of equitable disgorgement related to Enable's use of the Property during the time in which sought a renewed easement.

Enable may have had a legal duty to remove its pipeline from the Property upon the expiration of the initial easement. But so long as Enable was engaged in the renewal process and Plaintiffs had not demanded the pipeline be removed, logistical realities, applicable BIA regulations, and the principles of equity upon which they are based dictated that Enable should have been allowed to leave its pipe on the Property and later been charged the fair-market rental value for the holdover term. For the reasons set forth below, Plaintiffs' request for further relief during this trespass period should be rejected.

## RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Enable admits that an easement was granted to Producer's in 1980 and that Enable Oklahoma Intrastate Transmission LLC ("EOIT") is a successor-in-interest to Producer's. Enable denies that either Enable Midstream Partners, LP or Enable GP, LLC are successors-in-interest to Producer's.

6.      Enable admits that in 1999 EOIT's predecessor-in-interest, Enogex Inc. (which later became Enogex LLC and then EOIT) acquired the stock of Producer's.[1]

7.      Enable admits the easement granted in 1980 expired on November 19, 2000, but again notes the easement was owned only by EOIT (Enogex Inc. at the time) and not Enable Midstream Partners, LP or Enable GP, LLC.

8.      Enable admits that Enogex Inc. submitted a right-of-way renewal application to the BIA in June 2002. There is not evidence which shows a majority of the beneficial landowners accepted this offer, and Ms. Davilla (who owns less than 50% of the beneficial ownership of the Property), returned a consent form in which she rejected the offer. *See* [Dkt. No. 136-16]. Enable, however, disputes that this offer "was rejected by a majority of

---

[1] EOIT is a limited subsidiary of Enable Midstream Partners, LP, a publicly traded limited liability partnership. Enable GP LLC is the general partner of this limited partnership.

the landowners." There has been no evidence adduced to support Plaintiffs' contention that Enogex's offer "was rejected by a majority of the landowners."

9.   Admitted.

10.  Admitted.

11.  Enable admits that Enogex paid and Plaintiffs (or their predecessors) received the trespass assessment levied by the BIA. Enable, however, disputes that Enogex "acknowledged that it was trespassing" at the time this payment was made. Plaintiffs cite Director Deerinwater's letter in support of this contention, but nothing in the letter states that Enogex ever made such an acknowledgement. The letter, instead, merely states that an assessment was levied, paid by Enogex, and accepted by the beneficial owners of the Property. *See* [Dkt. 136-24] at (Davilla0071-73).

12.  Enable admits that based on an independent appraisal that was approved by the BIA's Office of Special Trustee, in 2002 Enogex made an offer of $40 per rod to renew the easement. Following this submission, Enogex sought the consent of a majority of the beneficial landowners to the $40 per rod offer. *See* [Dkt. No. 136] at 7-8 (UMF Nos. 23-29). When this consent was not received, the BIA cancelled Enogex's application and levied the trespass assessment in 2006. *See id.* at 11 (UMF Nos. 42-43).

Enable admits that after its 2002 application was cancelled by the BIA, it did not increase its $40 per rod offer to the beneficial owners of the Property. Plaintiffs intimate that this decision not to offer more money constitutes "bad faith" on the part of Enogex. But this contention is not borne out by the facts.

After Enogex's 2002 application was cancelled, there "was kind of a mediation, if you will, to try to find resolution to the differences" between the parties. *See id.* at 12 (UMF No. 46). Enogex's offer of $40 per rod called for a total of $3,080 to be paid for the renewed easement. The beneficial landowners' demand was $63,600. *See id.* at 9-10 (UMF No. 37). And as Enogex's Director of Right of Way Brian Green has explained, because the beneficial landowners "were very solid on their [$63,600] number," it was "difficult for [Enogex] to offer $2 more or something per rod to sweeten the pot." *See* [Ex. "1"] (Green Depo.) at 46:19-24. And in addition to the wide disparity between the parties' positions, it was also difficult for Enogex to offer more than the $40 per rod because "at that particular time the going rate for [Enogex] buying new [perpetual] right-of-way for private landowners was $40 a rod." *See id.* at 46:24-47:1.

Following the "mediation" which took place in late 2007, Enogex recognized that in light of the facts of the situation – most notably Plaintiffs' $63,600 demand – making an incrementally larger offer to Plaintiffs was unlikely to be productive. *See id.* at 46:19-24. So, rather than make such an offer, Enogex decided it would condemn an easement over the Property; a legal right which Enogex possessed at the time. *See* [Dkt. No. 136] at 13 (UMF Nos. 50-51). The BIA, however, urged Enogex not to condemn, but to instead re-submit a new application at the same $40 per rod that had been previously offered. *See id.* at 13 (UMF No. 53). And Enogex, which had never before filed a condemnation action on a Native American allotment and preferred not to do so in this instance, followed the BIA's recommendation and re-submitted its renewal application in May 2008. *See id.* at 13 (UMF Nos. 54-55).

From that point forward, Enogex did not hear anything from the BIA or from the landowners. The 2008 letter in which the BIA granted Enogex's application was never received by Enogex, nor was the landowners' appeal of that grant or the BIA's 2010 letter reversing its prior grant of a renewed easement. And at no point during all this or at any time prior to the month before this lawsuit was filed did the landowners ever reach out to Enogex to discuss the situation or demand the pipeline be removed from the Property. *See id.* at 14-16 (UMF Nos. 57-62, 68).

Against this backdrop, Enable respectfully submits it cannot be said to have acted unreasonably or in "bad faith," as Plaintiffs suggest. Enogex recognized that Plaintiffs were unlikely to accept the $40 per rod offer or any other amount that was modestly more than $3,080 for a renewed easement. In light of this reality, Enogex determined that although undesirable, condemnation was the most appropriate way to deal with the situation. Enogex was, however, persuaded by the BIA to forego condemnation and a new application was submitted. This was the last Enable heard of the situation until Plaintiffs' demand letter, sent by counsel, was sent on August 21, 2015, a hiatus in communication that was not unusual given Enable's prior dealings with the BIA. *See* [Dkt. 136] at 12, 14, 16 (UMF Nos. 48, 57-62, 68).

13.     Enable admits that in June 2008, the BIA sent a letter to the beneficial owners of the Property in which it explained that the renewal application Enogex had submitted in May 2008 had been approved. Enable, however, disputes Plaintiffs' contention that the "reasons" for this approval "are still unexplained." In its June 23, 2008 letter, the BIA explained, in detail, the basis for its decision. The BIA began by observing that "[t]he $40.00

6

per rod offer from Enogex [met] the appraisal for a new easement of an already existing buried pipeline." *See* [Dkt. No. 136-29]. The BIA went on to note that "[r]egulations found in 25 Code of Federal Regulations Part 169.3(c)(5) allow the Secretary to grant rights-of-way over and across individually owned lands without the consent of the individual Indian owners when the owners of interest in the land are so numerous that the Secretary finds it would be impracticable to obtain their consent, and also, finds <u>that the grant will cause no substantial injury to the land or any owner thereof.</u>" *Id.* From there, the BIA explained that "<u>[i]t is our decision to approve the new easement for Enogex for the reasons that it has been impracticable to obtain a majority of the ownership consent, the granting of the easement will not cause any injury to the land or the ownership, and to prevent a condemnation action in United States Federal Court.</u>" *Id.* (emphasis in original).

14.     Enable admits that a majority of the beneficial owners of the Property did not give consent prior to the BIA's issuance of its June 23, 2008 letter.

15.     Enable admits that a certain number, though not all, of the beneficial owners of the Property appealed the BIA's June 23, 2008 approval. And Enable admits that in 2010, this appeal was granted. Enable, however, disputes Plaintiffs' characterization of the bases for the BIA's 2010 decision. Director Deerinwater did conclude that the Acting Superintendent of the Anadarko Agency of the BIA "lacked authority to approve the May 30, 2008" renewal application submitted by Enogex "because the required consents from the . . . landowners were never attained." *See* [Dkt. No. 136-24] at (Davilla0073). Director Deerinwater did not, however, conclude that "the $40/rod price offered by [Enogex] was unreasonable," as alleged by Plaintiffs. To the contrary, Director Deerinwater acknowledged

this $40 per rod offer was premised on an appraisal that reviewed "established comparable information for similar transactions." *Id.* Director Deerinwater then noted that this appraised rate "is not a 'set in stone' value," but that instead "[t]he appraisal value is a basis for negotiations and establishes a bottom value but does not limit in any manner, the potential for a higher negotiated price." *Id.* Thus, while Director Deerinwater observed that "[a] review of recent transactions reveals a range of $60 to $80 per rod" and that this information could be used as part of a negotiation in which the beneficial landowners might seek more than the $40 per rod that was offered, he did not, as Plaintiffs suggest, conclude that Enogex's $40 per rod offer was "unreasonable."

16.    Admitted.

17.    Admitted.

18.    Enable admits that EOIT continued to operate its pipeline under the Property until November 30, 2018 and that it did not obtain express consent from a majority of the beneficial owners of the Property to do so. The implied consent of Plaintiffs can, however, be inferred from the fact that armed with the knowledge that the pipeline remained under the Property after the 1980 easement expired, Plaintiffs never asked or demanded that it be removed prior to filing this lawsuit. *See* [Dkt. No. 136-19] at 63:11-25; 64:16-65:13. Moreover, Enable disputes Plaintiffs' suggestion that in 2010, the BIA gave a "directive that the Pipeline should be removed if . . . consent was not obtained." In fact, Director Deerinwater made clear that he was *not* ordering an immediate removal of the pipeline from the Property in March of 2010. Rather, Director Deerinwater "remand[ed] th[e] case for further negotiation" and indicated that only if these efforts were unsuccessful, Enable

8

"should[, at some time in the future,] be directed to move the pipeline off the subject property." *See* [Dkt. No. 136-24] at (Davilla0073). Put otherwise, Director Deerinwater: (a) did not order immediate removal of the pipeline; (b) indicated there should, in the wake of his decision, be further negotiations – which did not occur given that Plaintiffs, who were the only parties aware of the BIA's 2008 and Director Deerinwater's order, never contacted Enogex; and (c) that only if these negotiations stalled would the BIA, at some point in the future, direct Enable to remove the pipeline – something which also did not occur, this time because Plaintiffs: (i) instructed the BIA not to contact Enogex because their counsel would do so; (ii) did not obtain counsel who contacted Enogex until shortly before filing this lawsuit; and (iii) never told the BIA about what has happening (or not happening) with Enogex. *See* [Dkt. No. 136] at 14-16 (UMF Nos. 57-62; 68).

## ARGUMENT & AUTHORITIES

As Plaintiffs note, in previously granting partial summary judgment to Plaintiffs on the issue of trespass liability, this "Court did not reach the issue of when the trespass first commenced . . . ." *See* Motion [Dkt. No. 135] at 7. And while the question of when the trespass commenced was not raised in connection with Enable's appeal, the Tenth Circuit did state, albeit in dicta, that the "expiration of the easement . . . show[s] that Enable lacks a legal right to keep the pipeline in the ground." *See* [Dkt. No. 136-37] at 15. Based on this and other language from the Tenth's Circuit's Opinion, Plaintiffs ask this Court to conclude "the trespass commenced on November 19, 2000, and that Plaintiffs are entitled to recovery at trial for the entire trespass period beginning on that date." *See* [Dkt. No. 135] at 21.

Enable acknowledges the language of the Tenth Circuit's Opinion and its dicta regarding the effect of the easement's expiration. But as applicable federal regulations – most notably 25 C.F.R. § 169.410 – make clear, when the grantee of a right-of-way easement over a Native American allotment holds over, the obligation to vacate the property is tolled while good faith renewal negotiations are taking place. Plaintiffs acknowledge this reality, but make two arguments as to why § 169.410 should not apply.

Plaintiffs first say that because Enogex did not submit a renewal application to the BIA until June 14, 2002 (approximately 2 years after the 1980 easement expired), there can be no tolling of any trespass during this period because there were no negotiations taking place at the time. *See* [Dkt. No. 135] at 15 ("Enable was thus indisputably in trespass from the date the easement expired until June 14, 2002."). This argument ignores the fact that in 2006, the BIA levied, Enogex paid, and Plaintiffs accepted a trespass assessment which resolved all trespass issues which existed through that date. *See* [Dkt. No. 136] at 11-12 (UMF Nos. 43-45). In light of this reality, and regardless of when the trespass commenced, Plaintiffs are not entitled to any further recovery for the period of time prior to the payment and acceptance of the trespass assessment.

Following the payment of the trespass assessment, the parties engaged in "kind of a mediation, if you will, to try to find a resolution to [their] differences." *See id.* at 12 (UMF No. 46). When this proved unsuccessful, Enogex formulated an intent to condemn an easement, but was talked out of its decision by the BIA, which asked Enogex to re-submit its renewal application. *See id.* at 12-13 (UMF Nos. 46-55). After Enogex resubmitted its application at the BIA's urging, it did not hear from either the BIA or Plaintiffs again until

10

shortly before this lawsuit was filed, which was consistent with Enable's prior dealings with the BIA. *See id.* at 14-16 (UMF Nos. 57-68).

Plaintiffs contend that Enogex's actions were not taken in "good faith" and thus, the company's obligation to vacate the Property was never tolled under 25 C.F.R. § 169.410 and/or the principles of law and equity which undergird it. *See* [Dkt. No. 135] at 13-17. This is incorrect. As discussed more fully below, the undisputed facts show Enable always acted reasonably and in good faith in light of the circumstances. Thus, pursuant to § 169.410 and the principles of law and equity, Plaintiffs are entitled only to the fair market rental value of the Property during the holdover period, not the trespass damages and remedies (including disgorgement) which they seek.

## I. ANY TRESPASS ISSUES FOR THE PERIOD BETWEEN NOVEMBER 19, 2000 AND SEPTEMBER 13, 2006 HAVE BEEN RESOLVED AND PLAINTIFFS' SUMMARY JUDGMENT REQUEST TO BE ENTITLED TO TRESPASS REMEDIES FOR THIS PERIOD SHOULD BE DENIED

As Enable has explained in its Motion for Partial Summary Judgment, it is undisputed that in 2006 the BIA, as Plaintiffs' representative levied, Enogex paid, and Plaintiffs accepted a trespass assessment which was in an amount based upon an appraisal of the fair market value of a right-of-way easement for the period. *See* [Dkt. No. 136] at 35. By accepting this payment, Plaintiffs relinquished the right to be compensated for any use of the Property prior to the date of payment, which was September 13, 2006. *See, e.g., Valley Asphalt, Inc. v. Stimpel Wiebelhaus Assocs.*, 3 F. App'x 838, 840 (10th Cir. 2001) (explaining that "federal precedent[] and commentators have all made clear retention of a check offered as payment in full constitutes assent to the accord and satisfaction") (citations omitted). Consequently, Plaintiffs' request that the Court order that Plaintiffs "are entitled to recovery at trial for the

11

entire trespass period beginning on [November 19, 2000]" should be rejected. Regardless of when the trespass commenced, any issues concerning trespass that pre-date September 13, 2006 have been fully resolved.

## II.   BECAUSE ANY TRESPASS WAS TOLLED WHILE ENOGEX HAD A RENEWAL APPLICATION ON FILE AND/OR WAS OTHERWISE NEGOTIATING FOR A RENEWAL, PLAINTIFFS ARE ENTITLED ONLY TO FAIR MARKET RENTAL VALUE DURING THESE PERIODS AND PLAINTIFFS' SUMMARY JUDGMENT REQUEST FOR FURTHER RELIEF FOR THESE PERIODS SHOULD BE DENIED

Plaintiffs' Motion contends that because the Tenth Circuit stated the expiration of the easement on November 19, 2000 obligated Enogex to remove the pipe from the Property, Plaintiffs are entitled to recover trespass remedies "for the entire trespass period beginning on that date." *See* [Dkt. No. 135] at 21. In support of this position, Plaintiffs say that relevant BIA regulations concerning how to compensate allottees for holdover tenancies on Native American lands should be ignored and/or are inapplicable in light of the facts of this case. This argument should be rejected. As discussed more fully below, when the facts of this case and relevant BIA regulations are examined, it is evident that the compensation Plaintiffs are owed for Enable's use of the Property while a renewal application was on file and/or Enogex was otherwise negotiating for the renewal of the 1980 easement is the fair market rental value of the Property.[2]

---

[2] As noted *supra*, Plaintiffs' "all or nothing" approach to equitable relief was rejected by the Tenth Circuit in connection with Plaintiffs' request for an injunction requiring removal of the pipeline from the Property. The Tenth Circuit explained that because "the sheer right to exclude simply cannot begin an end the equitable analysis," "by ordering Enable to remove the pipeline on the basis of liability alone, the district court legally erred and thus abused its discretion." *See* [Dkt. No. 136-37] at 28, 29-30. Ignoring this dictate, Plaintiffs once more ask the Court to forego the balancing of equities and conclude that regardless of the fact Enable participated in renewal negotiations, because Enable did not immediately remove the pipeline following the expiration of the initial easement, an award of equitable disgorgement is warranted.

The federal government's ability to grant rights-of-way through Native American trust lands such as the Property at issue here is governed by Chapter 8 of Title 25 of the United States Code; specifically 25 U.S.C. §§ 323-328. As a part of this statutory scheme, 25 U.S.C. § 328 authorizes the Secretary of the Interior "to prescribe any necessary regulations for the purpose of administering the provisions of sections 323 to 328" of Title 25 of the United States Code. And acting pursuant to this authority, the Secretary has promulgated regulations regarding rights-of-way over Indian lands that are set forth in Part 169 of subchapter H of Title 25 of the Code of Federal Regulations.

Contained within this regulatory scheme is 25 C.F.R. § 169.201(c). This provision provides that initial right-of-way easements on Native American allotments granted to oil and gas companies are generally to be 20 years in duration. *See id.* Notwithstanding this temporal limitation, in almost all circumstances in which an oil and gas company receives a right-of-way easement over a Native American allotment, the company intends to utilize the infrastructure installed pursuant to the easement – in this case a natural gas pipeline – for more than 20 years. Consequently, the need for oil and gas companies to renew right-of-way easements across Native American allotments arises with frequency.

When renewal of a 20-year right-of-way easement over a Native American allotment becomes necessary, it would be ideal for the party holding the right-of-way easement to initiate the process prior to the expiration of the easement. That unfortunately did not happen here for reasons explained in Enable's Motion for Partial Summary Judgment. *See* [Dkt. No. 136] at 4-5 (UMF Nos. 5-13). But as the facts of this case demonstrate, even when holders of rights-of-way easements submit renewal applications prior to expiration, the

13

realities of the manner in which the BIA operates can lead to delays in processing renewals that result in holdover tenancies.

As Plaintiffs and the United States Supreme Court have observed, "the BIA 'is faced with an almost staggering problem in attempting to discharge its trust obligations with respect to thousands upon thousands of scattered Indian allotments.'" *See* [Dkt. No. 135] at 20 (quoting *Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 374 (1968)). As a result, it can take years for the BIA to process right-of-way easement renewal applications. Indeed, one of the contract land men who Enable has hired to assist in its work renewing right-of-way easements over Native American allotments has testified that he has had "some that started in 2003 that were completed in 2016." *See* [Dkt. No. 136-11] at 34:1-2. And this is consistent with the experience of: (a) Enable's Right-of-Way Director Brian Green, who has testified that he is accustomed to BIA right-of-way renewal negotiations "stretch[ing] out of a number of years," *see* [Dkt. No. 136-6] at 49:7-19; and (b) Plaintiff Mayredean Palmer (who worked for Phillips and DCP in their right-of-way departments), who has testified that "over the years, the BIA went through spells where they were very slow in getting -- . . . responses back" to renewal applicants, *see* [Dkt. No. 136-9] at11:7-25; 16:12-23.

Because right-of-way easements across Native American allotments generally do not exceed 20 years in duration and therefore routinely need to be renewed, and because it can take years to obtain these renewals from the BIA, it is inevitable that some number of holdover tenancies will occur. 25 C.F.R. § 169.413 indicates that in these circumstances – *i.e.*, when an "entity . . . uses[] Indian land . . . without a right-of-way and a right-of-way is

14

required" – "the unauthorized . . . use is a trespass." And this sentiment is referred to in the Tenth Circuit's Opinion in this case.

Enable disputes the notion that a holdover tenant that has not been asked to vacate a property and is working with the landowners and the BIA to seek renewal of its easement can be considered a trespasser. But regardless of whether a trespass has occurred, the material question to be answered on this Motion for Partial Summary Judgment in these circumstances is what compensation should be paid to the landowners for the use of their property during the period of time in which no easement is actually on file. And the answer to this question is guided by 25 C.F.R. § 169.410, a regulation captioned: "What will BIA do if a grantee remains in possession after a right-of-way expires or is terminated or cancelled?"

The text of § 169.410 reads as follows:

> If a grantee remains in possession after the expiration, termination, or cancellation of a right-of-way, and is not accessing the land to perform reclamation or other remaining grant obligations, we may treat the unauthorized possession as a trespass under applicable law and will communicate with the Indian landowners in making the determination whether to treat the unauthorized possession as a trespass. Unless the parties have notified us in writing that they are engaged in good faith negotiations to renew or obtain a new right-of-way, we may take action to recover possession on behalf of the Indian landowners, and pursue any additional remedies available under applicable law, such as a forcible entry and detainer action. The holdover time will be charged against the new term.

*See* [Ex. "2"].

According to § 169.410, so long as a holdover tenant is a participant in good faith renewal negotiations, the BIA will refrain from either: (a) taking action to recover possession of the property for the beneficial landowners; or (b) pursuing additional remedies against the holder of the expired easement. Put otherwise, and for reasons that are evident, if the

logistics of the situation lead to a holdover tenancy, the BIA will not seek to eject the tenant while renewal negotiations are ongoing or seek payment from the tenant for its use of the property. Instead, the BIA will wait until the situation is resolved and, if a new easement is granted, "[t]he holdover time will be charged against the new term."[3]

This, of course, leaves open the final and most relevant question to this case: What compensation is owed to landowners if holdover negotiations fail and a tenant is required to later vacate the property? In these circumstances, "[t]he holdover time" cannot be "charged against the new term" because there is no new term. But the landowners are, without question, entitled to compensation for the use of their property during the holdover period.

According to Plaintiffs, holdover tenants who are unable to obtain a renewed easement should be disgorged of any economic benefit they receive from using the property during the holdover period. However, as BIA regulations and actions make clear, and the law of equity confirms, this is incorrect. Rather, the proper remedy for a holdover tenant's

---

[3] Plaintiffs are, of course, correct in noting that § 169.410 was promulgated after this litigation was filed. It should, however, be noted that the BIA's dealings with the parties prior to litigation were consistent with the policy set forth in § 169.410. And this is particularly so with regard to the August 24, 2006 trespass assessment and the discussion thereof in Director Deerinwater's March 23, 2010 appellate opinion.

The trespass assessment levied in August of 2006 was in an amount of "$2 per rod per year (extrapolated from $40 per rod for a 20-year easement)." *See* [Dkt. No. 135] at 4 (UMF No. 10). In discussing this assessment, Director Deerinwater explained that because "[s]ubmitting [a renewal] application tolls the approval from that date and establishes the time frame wherein the pipeline was in trespass," "Enogex paid four extra years of trespass fees when considering Enogex's application tolled the [right-of-way] grant from June 14, 2002," the date upon which the renewal application was filed. *See* [Dkt. No. 136-24] at (Davilla000072-73). Put otherwise, and consistent with the plain language of § 169.410, Director Deerinwater explained that during all periods in which Enogex was working with Plaintiffs and the BIA to renew its easement, there should not be a trespass assessment, but instead, this "holdover time will be charged against the new term."

use of a Native American allotment while seeking renewal is the payment of fair market value of a right-of-way easement to the landowners for the holdover period.

If the parties reach a deal on renewal, the fair market rental value owed to the landowners is set by the terms of the parties' agreement and the "holdover time [is] charged against the new term." 25 C.F.R. § 169.410. If the parties do not reach a deal on renewal, the fair market rental value is measured by an independent appraisal of the value of a right-of-way easement over the property. This is confirmed by the manner in which the BIA dealt with Enogex after cancelling its 2002 renewal application in 2006.

At the time Enogex's renewal application was terminated, the BIA made clear that the "cancellation d[id] not relieve Enogex's responsibility for payment of the time of continued use of the line from the date of the previous easement (November 19, 2000) to the present." *See* [Dkt. No. 135-11]. To determine what Enogex owed to the landowners for this period, the BIA "requested an appraisal" of the fair market value of a right-of-way easement over the Property for this period. *See id.* And based upon this, the BIA levied the trespass assessment in accordance with what "[m]arket conditions for the time period described support[ed]." *See* [Dkt. No. 136-21].

Not only is a payment of fair market rental value for the holdover period consistent with BIA actions and regulations, it also comports with the law of equity – a fact which is highly relevant given that Plaintiffs seek the remedy of disgorgement in this case. As Enable explained in its Motion for Partial Summary Judgment, "[d]isgorgement is by nature an equitable remedy," *see SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006), and the "exercise of a court's equity powers. . . must be made on a case-by-case basis." *Holland v.*

*Florida*, 130 S. Ct. 2549, 2563 (2010). Put otherwise, in evaluating a request for an equitable remedy such as disgorgement, a court must "shape [its] relief 'to fit its view of the balance of the equities and hardships,' and . . . fashion relief tailored to the unique circumstances of [this] case." *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 102 (3d Cir. 2012) (quoting 1 Dan B. Dobbs, Law of Remedies § 2.4(1), at 92 (2d ed. 1993) (citing *Brown v. Plata*, 131 S. Ct. 1910, 1944 (2011)).

In the case of a holdover tenant which, like Enogex, sought renewal and was never asked to vacate the property,[4] equitable considerations do not counsel for an award of disgorgement if renewal negotiations prove unsuccessful. Were this not so, landowners would be incentivized to drag out renewal negotiations with an eye toward ultimately disgorging benefits that vastly exceed any reasonable approximation of damage suffered and/or the fair market value of an easement. In other words, if landowners could disgorge benefits received during renewal negotiations, they would be "encourage[d] . . . to intentionally refrain from filing suit until such time as [their tenants] ha[d] amassed huge profits flowing from alleged misconduct." *Hammond v. Cty. of Madera*, 859 F.2d 797, 804 (9th Cir. 1988).[5] In equity, "[s]uch delay and unjust enrichment cannot be rewarded." *Id.*

Plaintiffs were the only ones who knew the BIA had granted Enogex's 2008 renewal application, reversed its decision, and remanded the case for further negotiations. *See* [Dkt. No. 136] at 14-16 (UMF Nos. 57-62; 68). It is undisputed Plaintiffs did not reach out to

---

[4] Enable is mindful that the Tenth Circuit stated that the filing of this lawsuit "acted as a demand for removal," *see* [Dkt. No. 136-37] at 19 n.5, but it is undisputed no pre-suit demand to vacate was ever made, *see* [Dkt. No. 136] at 15-16 (UMF No. 68).

[5] And even if negotiations are not intentionally dragged out, there is no justification for providing a windfall to Plaintiffs measured by economic benefits Enable received during protracted negotiations that were substantially within Plaintiffs' control to terminate.

Enogex to negotiate or demand the pipeline be removed prior to the filing of this lawsuit. *See id.* at 15-16 (UMF No. 68). Plaintiffs attribute this to their inability to find legal counsel to assist them. *See id.* at 15 (UMF No. 65). Neither equitable considerations nor the regulations or actions of the BIA suggest or support the disgorgement of benefits received by Enogex while it sought renewal during the holdover period.

Plaintiffs in this circumstance are left to argue Enogex's renewal negotiations were not conducted in "good faith" and thus, application of 25 C.F.R. § 169.410 is not warranted. *See* [Dkt. No. 135] at 13-17. The facts of the case do not, however, support this position. Instead, the facts show Enogex always acted reasonably in light of the circumstances.

Plaintiffs begin by attempting to make much of a contention that "[d]espite being on notice that the easement expired on November 19, 2000, Enable did not take any action to renew the easement until 2002." *See id.* at 15. Plaintiffs' suggestion that Enable was "on notice" that the easement would expire is premised on a theory of constructive notice and ignores the actual facts developed in the record. These facts demonstrate that Enable's delay in obtaining actual knowledge of the easement's expiration was attributable to logistical issues created by the size and nature (a stock, rather than asset purchase) of the Enogex / TransOk acquisition and TransOk's poor record keeping practices. *See* [Dkt. No. 136] at 4-5 (UMF Nos. 5; 7-13). As soon as these logistical issues were dealt with and Enogex learned of the expiration of the easement, it promptly began the renewal application process. *See id.*

Plaintiffs next take issue with the fact "Enable never attempted to reach out to the landowners before submitting the renewal application" in 2002. *See* [Dkt. No. 135] at 15. But this ignores the testimony of those involved who have explained that an easement owner

19

such as Enogex cannot contact landowners prior to submitting a renewal application because the BIA will not release the names of the landowners until an application is submitted. *See* [Dkt. No. 136] at 7-8 (UMF Nos. 23-27). Enogex submitted its renewal application in June 2002, but did not receive the names of the landowners from the BIA until July 2004, at which time it contacted the landowners to seek their consent. *See id.*

Finally, Plaintiffs take issue with the fact Enable did not offer more than $40 per rod in negotiations with Plaintiffs and, when this number was rejected, formulated an intent to condemn an easement. *See* [Dkt. No. 135] at 15-16. As discussed in response to UMF No. 12, Enogex was not, as Plaintiffs suggest, somehow fixated on a "take it or leave it" $40 per rod number. Rather, it was the actions of Plaintiffs that dictated the futility of Enogex increasing its initial offer as part of a negotiation with Plaintiffs.

Enable was required to make the first renewal offer and to do so based on an independent appraisal of the value of a renewed easement. *See* [Dkt. No. 136] at 5 (UMF No. 14). That appraisal showed, and Enable offered, a value of $40 per rod. *See id.* at 5-7 (UMF Nos. 15-20; 23). On several occasions, the BIA explained that this offer was supported by the appraisal and encouraged the landowners to accept it. *See id.* at 8-9, 11 (UMF Nos. 31, 35, and 41). Plaintiffs, however, countered Enogex's $3,080 offer with a demand of $63,600; an amount that exceeded the value of the entire Property within which the easement was located, as determined by the independent appraisal. *See id.* at 9-10 (UMF No. 37).

Because Plaintiffs "were very solid on their [$63,600] number," it was "difficult for [Enogex] to offer $2 more or something per rod to sweeten the pot." *See* [Ex. "1"] (Green Depo.) at 46:19-24. In other words, given the substantial gap between the parties' numbers

and the intransigence of Plaintiffs' in their position, there was no reason for Enogex to believe that making an incrementally larger offer to Plaintiffs would advance negotiations. As a result, Enogex had two options: (1) abandon its attempt to renew the right-of-way easement by agreement and remove the pipeline from the Property; or (2) exercise its legal right to condemn an easement over the Property.

Enogex had never exercised its right to condemn an easement on a Native American allotment and preferred not to do so in this case. *See* [Dkt. No. 136] at 13 (UMF No. 54). Nevertheless, and in light of Plaintiffs' $63,600 demand, the company felt compelled to do so and communicated this decision to the BIA following the "mediation" which took place in late 2007. *See id.* at 12-13 (UMF Nos. 46; 50-51). The BIA, however, asked Enogex not to file for condemnation and to instead re-submit a renewal application, which Enogex did on May 23, 2008. *See id.* at 13 (UMF Nos. 53-55).

Following this re-submission, Enable had no further contact with the BIA or Plaintiffs until shortly before this lawsuit was filed when Plaintiffs" counsel sent a letter to Enable. *See id.* at 14-16 (UMF Nos. 57-62; 68). Unfortunately, this delay was not unusual based on Enable's prior experiences with the BIA's lag in processing renewal applications. *See id.* at 12 (UMF Nos. 47-48). And, it should be noted, when Enable was contacted again, there was not a demand from Plaintiffs that the pipeline be removed from the Property, but instead an invitation to rekindle negotiations about a renewal. *See id.* at 15-16 (UMF Nos. 67-68).

Based on its prior experience with Plaintiffs, Enable responded to the 2015 letter by initiating a condemnation action. *See Enable Oklahoma Intrastate Transmission, LLC v. A 25 Foot*

*Wide Easement*, Case No. Civ-15-1250-HE. Unbeknownst to Enable, however, just 6 months after it had (at the BIA's urging) passed up the opportunity to file a condemnation action in early 2008, 0.009% of the beneficial ownership of the Property escheated to the Kiowa Tribe, stripping Enable of the right to condemn. *See* [Dkt. No. 136] at 13 (UMF No. 56 *Pub. Serv. Co. of N.M. v. Barboan*, 857 F.3d 1101 (10th Cir. 2017). As a result, the parties moved forward with this trespass litigation.

Viewing these facts in their entirety, and examining them in the context of applicable BIA regulations, the BIA's dealings with the parties, and principles of equity, Plaintiffs should not be permitted to disgorge benefits Enable received from use of the Property during the holdover period. Regardless of when any trespass commenced – whether in November 2000 or at some later date – Plaintiffs, who never demanded Enable vacate the Property and participated in renewal negotiations themselves, should be awarded only the fair market value of easement rental during the holdover period. Any other remedy would be contrary to the law and the principles of equity.

## <u>CONCLUSION</u>

For the reasons set forth above, Enable respectfully requests the Court deny Plaintiffs' Motion for Partial Summary Judgment requesting the Court determine that Enable's trespass commenced on November 19, 2000 and that Plaintiffs are entitled to recover at trial for the entire trespass period beginning on that date.

Respectfully submitted,


*/s/ John A. Kenney*
John A. Kenney, OBA #4976
Michael D. McClintock, OBA #18105
Michael K. Avery, OBA #22476
**MCAFEE & TAFT A PROFESSIONAL CORPORATION**
Two Leadership Square, Tenth Floor
211 North Robinson
Oklahoma City, OK 73102
Telephone: 405/235-9621
Fax: 405/270-7212
Email: john.kenney@mcafeetaft.com
         michael.mcclintock@mcafeetaft.com
         michael.avery@mcafeetaft.com

         -and-

Stratton Taylor, OBA #10142
Toney D. Foster, OBA #16063
Clint Russell, OBA #19209
Kassie N. McCoy, OBA #31405
**TAYLOR, FOSTER, MALLETT, DOWNS, RAMSEY & RUSSELL**
400 West Fourth Street
P.O. Box 309
Claremore, OK 74018
Telephone: 918/343-4100
Fax: 918/343-4900
Email: staylor@soonerlaw.com
         tfoster@soonerlaw.com
         crussell@soonerlaw.com
         kmccoy@soonerlaw.com

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of April, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following registrants:

Stephanie C. Hudson
**OKLAHOMA INDIAN LEGAL SERVICES**
4200 Perimeter Center Dr., Ste.  222
Oklahoma City, OK 73112
hudson@oilsonline.org

-and-

Catherine F.  Munson
Keith M. Harper
Kristalyn Kinsel
**KILPATRICK TOWNSEND & STOCKTON, LLP**
607 14th Street, N.W., Ste.  900
Washington, D.C.  20005
cmunson@kilpatricktownsend.com
kharper@kilpatricktownsend.com
kkinsel@kilpatricktownsend.com

-and-

Dustin T. Greene
Elizabeth L. Wiinters
**KILPATRICK TOWNSEND & STOCKTON, LLP**
1001 West Fourth Street
Winston-Salem, NC 27101
dgreene@kilpatricktownsend.com
bwinters@kilpatricktownsend.com

**ATTORNEYS FOR PLAINTIFFS**

*/s/ John A. Kenney*